MARTIN ET AL. *v.* WILKS ET AL.

No. 87–1614. Argued January 18, 1989—Decided June 12, 1989*

*Together with No. 87–1639, *Personnel Board of Jefferson County, Alabama, et al.* v. *Wilks et al.*, and No. 87–1668, *Arrington et al.* v. *Wilks et al.*, also on certiorari to the same court.

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 769.

*James P. Alexander* argued the cause for petitioners in Nos. 87–1639 and 87–1668. With him on the briefs for petitioners in No. 87–1668 were *Robert K. Spotswood, Richard H. Walston, Michael R. Pennington,* and *James K. Baker. Frank M. Young III* and *James C. Huckaby, Jr.,* filed a brief for petitioners in No. 87–1639. *Robert D. Joffe* argued the cause for petitioners in No. 87–1614. With him on the briefs were *Thomas D. Barr, Robert F. Mullen, Paul C. Saunders, Alden L. Atkins, William L. Robinson, Richard T. Seymour, Stephen L. Spitz,* and *Susan W. Reeves.*

*Raymond P. Fitzpatrick, Jr.,* argued the cause for respondents Wilks et al. With him on the brief was *Courtney H. Mason, Jr. Deputy Solicitor General Merrill* argued the cause for the United States. On the brief were *Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Solicitor General Ayer, Deputy Assistant Attorney General Clegg, Michael R. Lazerwitz,* and *Dennis J. Dimsey.*†

†Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *James M. Shannon,* Attorney General of Massachusetts, *Alice Daniel,* Deputy Attorney General, and *Jane S. Schacter* and *Peter Sacks,* Assistant Attorneys General, *Don Siegelman,* Attorney General of Alabama, *John Steven Clark,* Attorney General of Arkansas, *John Van de Kamp,* Attorney General of California, *Joseph I. Lieberman,* Attorney General of Connecticut, *Frederick D. Cooke,* Corporation Counsel of the District of Columbia, *Robert A. Butterworth,* Attorney General of Florida, *Michael J. Bowers,* Attorney General of Georgia, *Jim Jones,* Attorney General of Idaho, *Linley E. Pearson,* Attorney General of Indiana, *Thomas J. Miller,* Attorney General of Iowa, *Robert T. Stephan,* Attorney General of Kansas, *Frederic J. Cowan,* Attorney General of Kentucky, *William J. Guste, Jr.,* Attorney General of Louisiana, *J. Joseph Curran, Jr.,* Attorney Genral of Maryland, *Hubert H. Humphrey III,* Attorney

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

A group of white firefighters sued the city of Birmingham, Alabama (City), and the Jefferson County Personnel Board (Board) alleging that they were being denied promotions in favor of less qualified black firefighters. They claimed that the City and the Board were making promotion decisions on the basis of race in reliance on certain consent decrees, and that these decisions constituted impermissible racial discrimination in violation of the Constitution and federal statutes. The District Court held that the white firefighters were precluded from challenging employment decisions taken pursuant to the decrees, even though these firefighters had not been parties to the proceedings in which the decrees were

General of Minnesota, *William L. Webster*, Attorney General of Missouri, *Mike Greely*, Attorney General of Montana, *Robert M. Spire*, Attorney General of Nebraska, *Brian McKay*, Attorney General of Nevada, *Stephen E. Merrill*, Attorney General of New Hampshire, *Cary Edwards*, Attorney General of New Jersey, *Robert Abrams*, Attorney General of New York, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Robert H. Henry*, Attorney General of Oklahoma, *James E. O'Neil*, Attorney General of Rhode Island, *T. Travis Medlock*, Attorney General of South Carolina, *Jim Mattox*, Attorney General of Texas, *Jeffrey Amestoy*, Attorney General of Vermont, *Mary Sue Terry*, Attorney General of Virginia, *Godfrey R. de Castro*, Attorney General of the Virgin Islands, *Charlie Brown*, Attorney General of West Virginia, *Donald J. Hanaway*, Attorney General of Wisconsin, and *Joseph B. Meyer*, Attorney General of Wyoming; for the American Civil Liberties Union et al. by *Steven R. Shapiro, John A. Powell, Michael J. Wahoske, Mark B. Rotenberg*, and *Leslie J. Anderson;* for the Equal Employment Advisory Council by *Robert E. Williams* and *Douglas S. McDowell;* and for the National League of Cities et al. by *Benna Ruth Solomon, Beate Bloch*, and *Zachary D. Fasman.*

Briefs of *amici curiae* urging affirmance were filed for the International Association of Fire Fighters, AFL-CIO, by *Thomas A. Woodley* and *Michael S. Wolly;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Anthony T. Caso.*

*N. Thompson Powers, Ronald S. Cooper, Barry L. Goldstein, Julius LeVonne Chambers*, and *Ronald L. Ellis* filed a brief for the NAACP Legal Defense and Educational Fund, Inc., et al. as *amici curiae.*

entered. We think this holding contravenes the general rule that a person cannot be deprived of his legal rights in a proceeding to which he is not a party.

The litigation in which the consent decrees were entered began in 1974, when the Ensley Branch of the National Association for the Advancement of Colored People and seven black individuals filed separate class-action complaints against the City and the Board. They alleged that both had engaged in racially discriminatory hiring and promotion practices in various public service jobs in violation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, and other federal law. After a bench trial on some issues, but before judgment, the parties entered into two consent decrees, one between the black individuals and the City and the other between them and the Board. These proposed decrees set forth an extensive remedial scheme, including long-term and interim annual goals for the hiring of blacks as firefighters. The decrees also provided for goals for promotion of blacks within the fire department.

The District Court entered an order provisionally approving the decrees and directing publication of notice of the upcoming fairness hearings. App. 694–696. Notice of the hearings, with a reference to the general nature of the decrees, was published in two local newspapers. At that hearing, the Birmingham Firefighters Association (BFA) appeared and filed objections as *amicus curiae*. After the hearing, but before final approval of the decrees, the BFA and two of its members also moved to intervene on the ground that the decrees would adversely affect their rights. The District Court denied the motions as untimely and approved the decrees. *United States* v. *Jefferson County*, 28 FEP Cases 1834 (ND Ala. 1981). Seven white firefighters, all members of the BFA, then filed a complaint against the City and the Board seeking injunctive relief against enforcement of the decrees. The seven argued that the decrees

would operate to illegally discriminate against them; the District Court denied relief. App. to Pet. for Cert. 37a.

Both the denial of intervention and the denial of injunctive relief were affirmed on appeal. *United States* v. *Jefferson County*, 720 F. 2d 1511 (CA11 1983). The District Court had not abused its discretion in refusing to let the BFA intervene, thought the Eleventh Circuit, in part because the firefighters could "institut[e] an independent Title VII suit, asserting specific violations of their rights." *Id.*, at 1518. And, for the same reason, petitioners had not adequately shown the potential for irreparable harm from the operation of the decrees necessary to obtain injunctive relief. *Id.*, at 1520.

A new group of white firefighters, the *Wilks* respondents, then brought suit against the City and the Board in District Court. They too alleged that, because of their race, they were being denied promotions in favor of less qualified blacks in violation of federal law. The Board and the City admitted to making race-conscious employment decisions, but argued that the decisions were unassailable because they were made pursuant to the consent decrees. A group of black individuals, the *Martin* petitioners, were allowed to intervene in their individual capacities to defend the decrees.

The defendants moved to dismiss the reverse discrimination cases as impermissible collateral attacks on the consent decrees. The District Court denied the motions, ruling that the decrees would provide a defense to claims of discrimination for employment decisions "mandated" by the decrees, leaving the principal issue for trial whether the challenged promotions were indeed required by the decrees. App. 237–239, 250. After trial the District Court granted the motion to dismiss. App. to Pet. for Cert. 67a. The court concluded that "if in fact the City was required to [make promotions of blacks] by the consent decree, then they would not be guilty of [illegal] racial discrimination" and that the defendants had "establish[ed] that the promotions of the black indi-

viduals . . . were in fact required by the terms of the consent decree." *Id.*, at 28a.

On appeal, the Eleventh Circuit reversed. It held that, "[b]ecause . . . [the *Wilks* respondents] were neither parties nor privies to the consent decrees, . . . their independent claims of unlawful discrimination are not precluded." *In re Birmingham Reverse Discrimination Employment Litigation*, 833 F. 2d 1492, 1498 (1987). The court explicitly rejected the doctrine of "impermissible collateral attack" espoused by other Courts of Appeals to immunize parties to a consent decree from charges of discrimination by nonparties for actions taken pursuant to the decree. *Ibid.* Although it recognized a "strong public policy in favor of voluntary affirmative action plans," the panel acknowledged that this interest "must yield to the policy against requiring third parties to submit to bargains in which their interests were either ignored or sacrificed." *Ibid.* The court remanded the case for trial of the discrimination claims, suggesting that the operative law for judging the consent decrees was that governing voluntary affirmative-action plans. *Id.*, at 1497.[1]

We granted certiorari, 487 U. S. 1204 (1988), and now affirm the Eleventh Circuit's judgment. All agree that "[i]t is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry* v. *Lee*, 311 U. S. 32, 40 (1940). See, *e. g.*,

---

[1] Judge Anderson, dissenting, "agree[d] with the opinion for the court that these plaintiffs [the *Wilks* respondents] were not parties to the prior litigation which resulted in the consent decree, and that the instant plaintiffs are not bound by the consent decree and should be free on remand to challenge the consent decree prospectively and test its validity against the recent Supreme Court precedent." *In re Birmingham Reverse Discrimination Employment Litigation*, 833 F. 2d, at 1503. He distinguished, however, between claims for prospective relief and claims for backpay, the latter being barred, in his opinion, by the City's good-faith reliance on the decrees. *Id.*, at 1502.

*Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 327, n. 7
(1979); *Blonder-Tongue Laboratories, Inc.* v. *University
Foundation*, 402 U. S. 313, 328–329 (1971); *Zenith Radio
Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 110 (1969).
This rule is part of our "deep-rooted historic tradition that
everyone should have his own day in court." 18 C. Wright,
A. Miller, & E. Cooper, Federal Practice and Procedure
§ 4449, p. 417 (1981) (hereafter 18 Wright). A judgment or
decree among parties to a lawsuit resolves issues as among
them, but it does not conclude the rights of strangers to those
proceedings.[2]

Petitioners argue that, because respondents failed to timely
intervene in the initial proceedings, their current challenge
to actions taken under the consent decree constitutes an im-
permissible "collateral attack." They argue that respond-
ents were aware that the underlying suit might affect them,
and if they chose to pass up an opportunity to intervene, they
should not be permitted to later litigate the issues in a new
action. The position has sufficient appeal to have com-
manded the approval of the great majority of the Federal
Courts of Appeals,[3] but we agree with the contrary view ex-

---

[2] We have recognized an exception to the general rule when, in certain
limited circumstances, a person, although not a party, has his interests ad-
equately represented by someone with the same interests who is a party.
See *Hansberry* v. *Lee*, 311 U. S. 32, 41–42 (1940) ("class" or "represent-
ative" suits); Fed. Rule Civ. Proc. 23 (same); *Montana* v. *United States*,
440 U. S. 147, 154–155 (1979) (control of litigation on behalf of one of the
parties in the litigation). Additionally, where a special remedial scheme
exists expressly foreclosing successive litigation by nonlitigants, as for
example in bankruptcy or probate, legal proceedings may terminate pre-
existing rights if the scheme is otherwise consistent with due process.
See *NLRB* v. *Bildisco & Bildisco*, 465 U. S. 513, 529–530, n. 10 (1984)
("[P]roof of claim must be presented to the Bankruptcy Court . . . or be
lost"); *Tulsa Professional Collection Services, Inc.* v. *Pope*, 485 U. S. 478,
(1988) (nonclaim statute terminating unsubmitted claims against the es-
tate). Neither of these exceptions, however, applies in these cases.

[3] For a sampling of cases from the Circuits applying the "impermissible
collateral attack" rule or its functional equivalent, see, *e. g., Striff* v.

pressed by the Court of Appeals for the Eleventh Circuit in these cases.

We begin with the words of Justice Brandeis in *Chase National Bank* v. *Norwalk*, 291 U. S. 431 (1934):

> "The law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger. . . . Unless duly summoned to appear in a legal proceeding, a person not a privy may rest assured that a judgment recovered therein will not affect his legal rights." *Id.* at 441.

While these words were written before the adoption of the Federal Rules of Civil Procedure, we think the Rules incorporate the same principle; a party seeking a judgment binding on another cannot obligate that person to intervene; he must be joined. See *Hazeltine, supra,* at 110 (judgment against Hazeltine vacated because it was not named as a party or served, even though as the parent corporation of one of the parties it clearly knew of the claim against it and had made a special appearance to contest jurisdiction). Against the background of permissive intervention set forth in *Chase National Bank,* the drafters cast Rule 24, governing intervention, in permissive terms. See Fed. Rule Civ. Proc. 24(a) (intervention as of right) ("Upon timely application anyone shall be permitted to intervene"); Fed. Rule

*Mason,* 849 F. 2d 240, 245 (CA6 1988); *Marino* v. *Ortiz,* 806 F. 2d 1144, 1146–1147 (CA2 1986), aff'd by an equally divided Court, 484 U. S. 301 (1988); *Thaggard* v. *Jackson,* 687 F. 2d 66, 68–69 (CA5 1982), cert. denied *sub nom. Ashley* v. *City of Jackson,* 464 U. S. 900 (1983) (REHNQUIST, J., joined by BRENNAN, J., dissenting); *Stotts* v. *Memphis Fire Dept.,* 679 F. 2d 541, 558 (CA6 1982), rev'd on other grounds *sub nom. Firefighters* v. *Stotts,* 467 U. S. 561 (1984); *Dennison* v. *Los Angeles Dept. of Water & Power,* 658 F. 2d 694, 696 (CA9 1981); *Goins* v. *Bethlehem Steel Corp.,* 657 F. 2d 62, 64 (CA4 1981), cert. denied, 455 U. S. 940 (1982); *Society Hill Civic Assn.* v. *Harris,* 632 F. 2d 1045, 1052 (CA3 1980). Apart from the instant one, the only Circuit decision of which we are aware that would generally allow collateral attacks on consent decrees by nonparties is *Dunn* v. *Carey,* 808 F. 2d 555, 559–560 (CA7 1986).

Civ. Proc. 24(b) (permissive intervention) ("Upon timely application anyone may be permitted to intervene"). They determined that the concern for finality and completeness of judgments would be "better [served] by mandatory joinder procedures." 18 Wright § 4452, p. 453. Accordingly, Rule 19(a) provides for mandatory joinder in circumstances where a judgment rendered in the absence of a person may "leave . . . persons already parties subject to a substantial risk of incurring . . . inconsistent obligations. . . ."[4] Rule 19(b) sets forth the factors to be considered by a court in deciding whether to allow an action to proceed in the absence of an interested party.[5]

---

[4] Rule 19(a) provides:

"A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction . . . *shall* be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) *the person claims an interest relating to the subject of the action* and is so situated that the disposition of the action in the person's absence may (i) *as a practical matter impair or impede the person's ability to protect that interest* or (ii) *leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.* If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action." (Emphasis added.)

[5] Rule 19(b) provides:

"If a person . . . cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether

Joinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or decree.[6] The parties to a lawsuit presumably know better than anyone else the nature and scope of relief sought in the action, and at whose expense such relief might be granted. It makes sense, therefore, to place on them a burden of bringing in additional parties where such a step is indicated, rather than placing on potential additional parties a duty to intervene when they acquire knowledge of the lawsuit. The linchpin of the "impermissible collateral attack" doctrine—the attribution of preclusive effect to a failure to intervene—is therefore quite inconsistent with Rule 19 and Rule 24.

Petitioners argue that our decisions in *Penn-Central Merger and N & W Inclusion Cases,* 389 U. S. 486 (1968), and *Provident Tradesmens Bank & Trust Co.* v. *Patterson,* 390 U. S. 102 (1968), suggest an opposite result. The *Penn-Central* litigation took place in a special statutory framework enacted by Congress to allow reorganization of a huge railway system. Primary jurisdiction was in the Interstate Commerce Commission, with very restricted review in a statutory three-judge District Court. Review proceedings

the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."

[6] The dissent argues, on the one hand, that respondents have not been "bound" by the decree but, rather, that they are only suffering practical adverse effects from the consent decree. *Post,* at 770–772. On the other hand, the dissent characterizes respondents' suit not as an assertion of their own independent rights, but as a collateral attack on the consent decrees which, it is said, can only proceed on very limited grounds. *Post,* at 783–787. Respondents in their suit have alleged that they are being racially discriminated against by their employer in violation of Title VII: either the fact that the disputed employment decisions are being made pursuant to a consent decree is a defense to respondents' Title VII claims or it is not. If it is a defense to challenges to employment practices which would otherwise violate Title VII, it is very difficult to see why respondents are not being "bound" by the decree.

were channeled to the District Court for the Southern District of New York, and proceedings in other District Courts were stayed. The District Court upheld the decision of the Interstate Commerce Commission in both the merger and the inclusion proceedings, and the parties to that proceeding appealed to this Court. Certain Pennsylvania litigants had sued in the District Court for the Middle District of Pennsylvania to set aside the Commission's order, and this action was stayed pending the decision in the District Court for the Southern District of New York. We held that the borough of Moosic, one of the Pennsylvania litigants, could not challenge the Commission's approval of the merger and inclusion in the Pennsylvania District Court, pointing out the unusual nationwide character of the action and saying "[i]n these circumstances, it would be senseless to permit parties seeking to challenge the merger and the inclusion orders to bring numerous suits in many different district courts." 389 U. S., at 505, n. 4.

We do not think that this holding in *Penn Central*, based as it was upon the extraordinary nature of the proceedings challenging the merger of giant railroads and not even mentioning Rule 19 or Rule 24, affords a guide to the interpretation of the rules relating to joinder and intervention in ordinary civil actions in a district court.

Petitioners also rely on our decision in *Provident Bank*, *supra*, as authority for the view which they espouse. In that case we discussed Rule 19 shortly after parts of it had been substantially revised, but we expressly left open the question whether preclusive effect might be attributed to a failure to intervene. 390 U. S., at 114–115.

Petitioners contend that a different result should be reached because the need to join affected parties will be burdensome and ultimately discouraging to civil rights litigation. Potential adverse claimants may be numerous and difficult to identify; if they are not joined, the possibility for inconsistent

judgments exists. Judicial resources will be needlessly consumed in relitigation of the same question.

Even if we were wholly persuaded by these arguments as a matter of policy, acceptance of them would require a rewriting rather than an interpretation of the relevant Rules. But we are not persuaded that their acceptance would lead to a more satisfactory method of handling cases like these. It must be remembered that the alternatives are a duty to intervene based on knowledge, on the one hand, and some form of joinder, as the Rules presently provide, on the other. No one can seriously contend that an employer might successfully defend against a Title VII claim by one group of employees on the ground that its actions were required by an earlier decree entered in a suit brought against it by another, if the later group did not have adequate notice or knowledge of the earlier suit.

The difficulties petitioners foresee in identifying those who could be adversely affected by a decree granting broad remedial relief are undoubtedly present, but they arise from the nature of the relief sought and not because of any choice between mandatory intervention and joinder. Rule 19's provisions for joining interested parties are designed to accommodate the sort of complexities that may arise from a decree affecting numerous people in various ways. We doubt that a mandatory intervention rule would be any less awkward. As mentioned, plaintiffs who seek the aid of the courts to alter existing employment policies, or the employer who might be subject to conflicting decrees, are best able to bear the burden of designating those who would be adversely affected if plaintiffs prevail; these parties will generally have a better understanding of the scope of likely relief than employees who are not named but might be affected. Petitioners' alternative does not eliminate the need for, or difficulty of, identifying persons who, because of their interests, should be included in a lawsuit. It merely shifts that responsibility to less able shoulders.

Nor do we think that the system of joinder called for by the Rules is likely to produce more relitigation of issues than the converse rule. The breadth of a lawsuit and concomitant relief may be at least partially shaped in advance through Rule 19 to avoid needless clashes with future litigation. And even under a regime of mandatory intervention, parties who did not have adequate knowledge of the suit would relitigate issues. Additional questions about the adequacy and timeliness of knowledge would inevitably crop up. We think that the system of joinder presently contemplated by the Rules best serves the many interests involved in the run of litigated cases, including cases like the present ones.

Petitioners also urge that the congressional policy favoring voluntary settlement of employment discrimination claims, referred to in cases such as *Carson* v. *American Brands, Inc.*, 450 U. S. 79 (1981), also supports the "impermissible collateral attack" doctrine. But once again it is essential to note just what is meant by "voluntary settlement." A voluntary settlement in the form of a consent decree between one group of employees and their employer cannot possibly "settle," voluntarily or otherwise, the conflicting claims of another group of employees who do not join in the agreement. This is true even if the second group of employees is a party to the litigation:

> "[P]arties who choose to resolve litigation through settlement may not dispose of the claims of a third party . . . without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors." *Firefighters* v. *Cleveland*, 478 U. S. 501, 529 (1986).

Insofar as the argument is bottomed on the idea that it may be easier to settle claims among a disparate group of affected persons if they are all before the court, joinder bids fair to accomplish that result as well as a regime of mandatory intervention.

For the foregoing reasons we affirm the decision of the Court of Appeals for the Eleventh Circuit. That court remanded the case for trial of the reverse discrimination claims. *Birmingham Reverse Discrimination*, 833 F. 2d, at 1500–1502. Petitioners point to language in the District Court's findings of fact and conclusions of law which suggests that respondents will not prevail on the merits. We agree with the view of the Court of Appeals, however, that the proceedings in the District Court may have been affected by the mistaken view that respondents' claims on the merits were barred to the extent they were inconsistent with the consent decree.

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

As a matter of law there is a vast difference between persons who are actual parties to litigation and persons who merely have the kind of interest that may as a practical matter be impaired by the outcome of a case. Persons in the first category have a right to participate in a trial and to appeal from an adverse judgment; depending on whether they win or lose, their legal rights may be enhanced or impaired. Persons in the latter category have a right to intervene in the action in a timely fashion,[1] or they may be joined as parties against their will.[2] But if they remain on the sidelines, they

---

[1] Federal Rule of Civil Procedure 24(a) provides in part:

"Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

[2] Federal Rule of Civil Procedure 19(a) provides in part:

"A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of

may be harmed as a practical matter even though their legal rights are unaffected.[3] One of the disadvantages of sideline-sitting is that the bystander has no right to appeal from a judgment no matter how harmful it may be.

In these cases the Court quite rightly concludes that the white firefighters who brought the second series of Title VII cases could not be deprived of their legal rights in the first series of cases because they had neither intervened nor been joined as parties. See *Firefighters* v. *Cleveland*, 478 U. S. 501, 529–530 (1986); *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 327, n. 7 (1979). The consent decrees obviously could not deprive them of any contractual rights, such as seniority, cf. *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757 (1983), or accrued vacation pay, cf. *Massachusetts* v. *Morash*, *ante*, p. 107, or of any other legal rights, such as the right to have their employer comply with federal statutes like Title VII, cf. *Firefighters* v. *Cleveland*, *supra*, at 529.[4] There is no reason, however, why the consent de-

the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest . . . ."

 [3] See *Provident Tradesmens Bank & Trust Co.* v. *Patterson* 390 U. S. 102, 110 (1968).

 [4] As CHIEF JUSTICE REHNQUIST has observed:

"Suppose, for example, that the Government sues a private corporation for alleged violations of the antitrust laws and then enters a consent decree. Surely, the existence of that decree does not preclude a future suit by another corporation alleging that the defendant company's conduct, even if authorized by the decree, constitutes an antitrust violation. The nonparty has an independent right to bring his own private antitrust action for treble damages or for injunctive relief. See 2 P. Areeda & D. Turner, Antitrust Law ¶ 330, p. 143 (1978). Similarly, if an action alleging unconstitutional prison conditions results in a consent decree, a prisoner subsequently harmed by prison conditions is not precluded from bringing suit on the mere plea that the conditions are in accordance with the consent decree. Such compliance might be relevant to a defense of good-faith immunity, see Pet. for Cert. in *Bennett* v. *Williams*, O. T. 1982, No. 82–1704, but it would not suffice to block the suit altogether." *Ashley* v. *City of Jackson*, 464 U. S. 900, 902–903 (1983) (opinion dissenting from denial of certiorari).

 In suggesting that compliance with a consent decree might be relevant to a defense of good-faith immunity, this passage recognizes that neither due

crees might not produce changes in conditions at the white firefighters' place of employment that, as a practical matter, may have a serious effect on their opportunities for employment or promotion even though they are not bound by the decrees in any legal sense. The fact that one of the effects of a decree is to curtail the job opportunities of nonparties does not mean that the nonparties have been deprived of legal rights or that they have standing to appeal from that decree without becoming parties.

Persons who have no right to appeal from a final judgment—either because the time to appeal has elapsed or because they never became parties to the case—may nevertheless collaterally attack a judgment on certain narrow grounds. If the court had no jurisdiction over the subject matter, or if the judgment is the product of corruption, duress, fraud, collusion, or mistake, under limited circumstances it may be set aside in an appropriate collateral proceeding. See Restatement (Second) of Judgments §§ 69–72 (1982); *Griffith* v. *Bank of New York*, 147 F. 2d 899, 901 (CA2) (Clark, J.), cert. denied, 325 U. S. 874 (1945). This rule not only applies to parties to the original action, but also allows interested third parties collaterally to attack judgments.[5] In both civil and criminal cases, however, the

---

process nor the Rules of Civil Procedure foreclose judicial recognition of a judgment that may have a practical effect on the interests of a nonparty.

[5] See F. James & G. Hazard, Civil Procedure § 12.15, p. 681 (3d ed. 1985) (hereinafter James & Hazard). Since at least 1874, this Court has recognized that a third party may collaterally attack a judgment if the original judgment was obtained through fraud or collusion. In a case brought by an assignee in bankruptcy seeking to recover property allegedly transferred in fraud of the bankrupt's debtors, the Court wrote:

"Judgments of any court, it is sometimes said, may be impeached by strangers to them for fraud or collusion, but the proposition as stated is subject to certain limitations, as it is only those strangers who, if the judgment is given full credit and effect, would be prejudiced in regard to some pre-existing right who are permitted to set up such a defense. Defenses of the kind may be set up by such strangers. Hence the rule that whenever a judgment or decree is procured through the fraud of either of the parties, or by the collusion of both, for the purpose of defrauding some third per-

grounds that may be invoked to support a collateral attack are much more limited than those that may be asserted as error on direct appeal.[6] Thus, a person who can foresee that a lawsuit is likely to have a practical impact on his interests may pay a heavy price if he elects to sit on the sidelines instead of intervening and taking the risk that his legal rights will be impaired.

In these cases there is no dispute about the fact that respondents are not parties to the consent decrees. It follows as a matter of course that they are not bound by those decrees.[7] Those judgments could not, and did not, deprive

---

son, such third person may escape from the injury thus attempted by showing, even in a collateral proceeding, the fraud or collusion by which the judgment was obtained." *Michaels* v. *Post*, 21 Wall. 398, 426–427 (1874) (footnote omitted).

See also *Wells Fargo & Co.* v. *Taylor*, 254 U. S. 175, 184 (1920); 1 A. Freeman, Judgments § 318, p. 634 (5th ed. 1925). Similarly, strangers to a decree are sometimes allowed to challenge the decree by showing that the court was without jurisdiction. *Id.*, at p. 633. But cf. *Johnson* v. *Muelberger*, 340 U. S. 581 (1951) (noting that under Florida law, a child, seeking to protect her interest in her father's estate, may not collaterally attack her parents' divorce for want of jurisdiction). Of course, unlike parties to a decree, the question of subject-matter jurisdiction is not res judicata as to interested third parties. Cf. *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694, 702, n. 9 (1982).

[6] We have long held that proceedings brought before a court collaterally "are by no means subject to all the exceptions which might be taken on a direct appeal." *Thompson* v. *Tolmie*, 2 Pet. 157, 162 (1829). See also *Teague* v. *Lane*, 489 U. S. 288, 303–310 (1989) (petition for writ of habeas corpus); *Liljeberg* v. *Health Services Aquisition Corp.*, 486 U. S. 847, 863–864 (1988) (Rule 60(b) motion); *United States* v. *Frady*, 456 U. S. 152, 165 (1982) (28 U. S. C. § 2255 motion); *Ackermann* v. *United States*, 340 U. S. 193, 197–202 (1950) (Rule 60(b) motion); *Sunal* v. *Large*, 332 U. S. 174, 177–179 (1947) (petition for writ of habeas corpus).

[7] As we held in *Firefighters* v. *Cleveland*, 478 U. S. 501, 529–530 (1986):

"Of course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori*, may not impose duties or obligations on a third party, without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting [individuals] . . . .

them of any legal rights. The judgments did, however, have a practical impact on respondents' opportunities for advancement in their profession. For that reason, respondents had standing to challenge the validity of the decrees, but the grounds that they may advance in support of a collateral challenge are much more limited than would be allowed if they were parties prosecuting a direct appeal.[8]

The District Court's rulings in these cases have been described incorrectly by both the Court of Appeals and this Court. The Court of Appeals repeatedly stated that the Dis-

---

And, of course, a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree. See, *e. g.*, *United States* v. *Ward Baking Co.*, 376 U. S. 327 (1964); *Hughes* v. *United States*, 342 U. S. 353 (1952); *Ashley* v. *City of Jackson*, 464 U. S., at 902 (REHNQUIST, J., dissenting from denial of certiorari); 1B Moore ¶ 0.409[5], p. 326, n. 2. However, the consent decree entered here does not bind Local 93 to do or not to do anything. It imposes no legal duties or obligations on the Union at all; only the parties to the decree can be held in contempt of court for failure to comply with its terms. See *United States* v. *Armour & Co.*, 402 U. S., at 676–677."

[8] The Eleventh Circuit, in a decision involving a previous attempt by white firefighters to set aside the consent decrees at issue in this litigation, itself observed: "There are . . . limitations on the extent to which a nonparty can undermine a prior judgment. A nonparty may not reopen the case and relitigate the merits anew; neither may he destroy the validity of the judgment between the parties." *United States* v. *Jefferson County*, 720 F. 2d 1511, 1518 (1983).

Professors James and Hazard describe the rule as follows:

"Ordinarily, a nonparty has no legal interest in a judgment in an action between others. Such a judgment does not determine the nonparty's rights and obligations under the rules of res judicata and he may so assert if the judgment is relied upon against him. But in some situations one's interests, particularly in one's own personal legal status or claims to property, may be placed in practical jeopardy by a judgment between others. In such circumstances one may seek the aid of a court of equity, but *the grounds upon which one may rely are severely limited.* The general rule is that one must show either that the judgment was void for lack of jurisdiction of the subject matter or that it was the product of fraud directed at the petitioner." James & Hazard § 12.15, p. 681 (emphasis supplied; footnotes omitted).

trict Court had "in effect" held that the white firefighters were "bound" by a decree to which they were not parties.[9] And this Court's opinion seems to assume that the District Court had interpreted its consent decrees in the earlier litigation as holding "that the white firefighters were precluded from challenging employment decisions taken pursuant to the decrees." *Ante*, at 758.[10] It is important, therefore, to make clear exactly what the District Court did hold and why its judgment should be affirmed.

## I

The litigation in which the consent decrees were entered was a genuine adversary proceeding. In 1974 and 1975, two groups of private parties and the United States brought three separate Title VII actions against the city of Birmingham (City), the Personnel Board of Jefferson County (Board), and various officials,[11] alleging discrimination in hir-

---

[9] The Court of Appeals wrote:

—"Both the City and the Board, however, denied that they had violated Title VII or the equal protection clause. Both contended that the plaintiffs were bound by the consent decrees and that the promotions were therefore lawful as a matter of law because they had been made pursuant to those decrees." *In re Birmingham Reverse Discrimination Employment Litigation*, 833 F. 2d 1492, 1496 (CA11 1987).

—"Without expressly so stating, the district judge treated the plaintiffs as if they were bound by the consent decrees and as if they were alleging solely that the City had violated the City decree." *Ibid.*

—"The court held that the plaintiffs—both the United States and the individual plaintiffs—were bound by the consent decrees." *Id.*, at 1497.

—"In effect, the court treated the plaintiffs as if they were parties to the City decree seeking an order to show cause why the City should not be held in civil contempt for violating the terms of the decree." *Id.*, at 1497, n. 16.

[10] See also, *ante*, at 762, where the Court suggests that the District Court held that its consent decrees had "conclude[d] the rights of strangers to those proceedings." (Footnote omitted.)

[11] These parties, along with six black firefighters who were party-plaintiffs to the 1974–1975 litigation, are petitioners herein.

ing and promotion in several areas of employment, including the fire department. After a full trial in 1976, the District Court found that the defendants had violated Title VII and that a test used to screen job applicants was biased. App. 553. After a second trial in 1979 that focused on promotion practices—but before the District Court had rendered a decision—the parties negotiated two consent decrees, one with the City defendants and the other with the Board. App. to Pet. for Cert. 122a (City decree), 202a (Board decree). The United States is a party to both decrees. The District Court provisionally approved the proposed decrees and directed that the parties provide notice "to all interested persons informing them of the general provisions of the Consent Decrees . . . and of their right to file objections." App. 695. Approximately two months later, the District Court conducted a fairness hearing, at which a group of black employees objected to the decrees as inadequate and a group of white firefighters—represented in part by the Birmingham Firefighters Association (BFA)—opposed any race-conscious relief. *Id.*, at 727. The District Court overruled both sets of objections and entered the decrees in August 1981. 28 FEP Cases 1834 (ND Ala. 1981).

In its decision approving the consent decrees, the District Court first noted "that there is no contention or suggestion that the settlements are fraudulent or collusive." *Id.*, at 1835. The court then explained why it was satisfied that the affirmative-action goals and quotas set forth in the decrees were "well within the limits upheld as permissible" in *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), and other cases. 28 FEP Cases, at 1836. It pointed out that the decrees "do not preclude the hiring or promotion of whites and males even for a temporary period of time," *ibid.*, and that the City's commitment to promote blacks and whites to the position of fire lieutenant at the same rate was temporary and was subject both to the availability of qualified candi-

dates and "to the caveat that the decree is not to be interpreted as requiring the hiring or promotion of a person who is not qualified or of a person who is demonstrably less qualified according to a job-related selection procedure," *id.*, at 1837. It further found that the record provided "more than ample reason" to conclude that the City would eventually be held liable for discrimination against blacks at high-level positions in the fire and police departments.[12] *Id.*, at 1838. Based on

---

[12] In approving the decree, the District Court expressed confidence that the United States and the black firefighters brought suit in good faith and that there was a strong evidentiary basis for their complaints. It observed:

"The objectors treat this case as one in which discrimination on the basis of race or sex has not been established. That is only partially true, at least as it relates to positions in the police and fire departments. This court at the first trial found—and the Fifth Circuit agreed—that blacks applying for jobs as police officers and firefighters were discriminated against by the tests used by the Personnel Board to screen and rank applicants. The evidence presented at the second trial established, at the .01 level of statistical significance, that blacks were adversely affected by the exam used by the Personnel Board to screen and rank applicants for the position of police sergeant. Since governmental employers such as the City of Birmingham have been limited by state law to selecting candidates from among those certified by the Board, one would hardly be surprised to find that the process as a whole has had an adverse effect upon blacks seeking employment as Birmingham police officers, police sergeants, or firefighters—regardless of whether or not there was any actual bias on the part of selecting officials of the City. A natural consequence of discrimination against blacks at entry-level positions in the police and fire departments would be to limit their opportunities for promotion to higher levels in the departments.

"Employment statistics for Birmingham's police and fire departments as of July 21, 1981, certainly lend support to the claim made in this litigation against the City—that, notwithstanding this court's directions in 1977 with respect to certifications by the Personnel Board for the entry-level police officer and firefighters positions and despite the City's adoption of a 'fair hiring ordinance' and of affirmative action plans, the effects of past discrimination against blacks persist. According to those figures, 79 of the 480 police officers are black, 3 of the 131 police sergeants are black, and none of the 40 police lieutenants and captains are black. In the fire department, 42 of the 453 firefighters are black, and none of the 140 lieu-

its understanding of the wrong committed, the court con-cluded that the remedy embodied in the consent decrees was "reasonably commensurate with the nature and extent of the indicated discrimination." *Ibid.* Cf. *Milliken* v. *Bradley*, 418 U. S. 717, 744 (1974). The District Court then rejected other specific objections, pointing out that the decrees would not impinge on any contractual rights of the unions or their members. 28 FEP Cases, at 1839. Finally, after noting that it had fully considered the white firefighters' objections to the settlement, it denied their motion to intervene as un-timely. *Ibid.*

Several months after the entry of the consent decrees, the Board certified to the City that five black firefighters, as well as eight whites, were qualified to fill six vacancies in the position of lieutenant. See App. 81. A group of white fire-fighters then filed suit against the City and Board challeng-ing their policy of "certifying candidates and making promo-tions on the basis of race under the assumed protection of consent settlements." App. to Pet. for Cert. 113a. The complaint alleged, in the alternative, that the consent de-crees were illegal and void, or that the defendants were not properly implementing them. *Id.*, at 113a–114a. The plain-tiffs filed motions for a temporary restraining order and a preliminary injunction. After an evidentiary hearing, the District Court found that the plaintiffs' collateral attack on the consent decrees was "without merit" and that four of the black officers were qualified for promotion in accordance with the terms of the decrees. App. 81–83. Accordingly, it de-nied the motions, *id.*, at 83, 85–86, and, for the first time in its history, the City had a black lieutenant in its fire department.

---

tenants, captains, and battalion chiefs are black." 28 FEP Cases, at 1837–1838.

The evidence of discrimination presented at the 1979 trial is described in greater detail in the United States' 100-page, post-trial brief, which is re-printed in the Joint Appendix. See App. 594–693.

The plaintiffs' appeal from that order was consolidated with the appeal that had been previously taken from the order denying the motion to intervene filed in the earlier litigation. The Court of Appeals affirmed both orders. See *United States* v. *Jefferson County*, 720 F. 2d 1511 (CA11 1983). While that appeal was pending, in September 1983, the *Wilks* respondents filed a separate action against petitioners. The *Wilks* complaint alleged that petitioners were violating Title VII, but it did not contain any challenge to the validity of the consent decrees. App. 130. After various preliminary proceedings, the District Court consolidated these cases, along with four other reverse discrimination actions brought against petitioners, under the caption *In re: Birmingham Reverse Discrimination Litigation*. *Id.*, at 218. In addition, over the course of the litigation, the court allowed further parties to intervene.[13]

On February 18, 1985, the District Court ruled on the City's motion for partial summary judgment and issued an opinion that, among other things, explained its understanding of the relevance of the consent decrees to the issues raised in the reverse discrimination litigation. *Id.*, at 277. After summarizing the proceedings that led up to the entry of the consent decrees, the District Court expressly "recognized that the consent decrees might not bar all claims of 'reverse discrimination' since [the plaintiffs] had not been parties to the prior suits."[14] *Id.*, at 279. The court then took a posi-

---

[13] Among those allowed to intervene were seven black firefighters who were parties to the consent decrees and who sought to defend the decrees; the United States, which reversed course in the litigation and aligned itself with the plaintiffs; and additional white firefighters pressing individual reverse discrimination claims.

[14] During an earlier hearing, the District Court informed counsel:

"I do believe that the Court of Appeals said there is no per se prohibition against an attack, an indirect attack, in any event by a person whose rights may be affected during the implementation or claims implementation of the decree. To the extent the motions to dismiss or summary judgment take that position, I think the Court of Appeals said, no, that is not the law of this Circuit." *Id.*, at 237.

tion with respect to the relevance of the consent decrees that differed from that advocated by any of the parties. The plaintiffs contended that the consent decrees, even if valid, did not constitute a defense to their action, cf. *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757 (1983), and, in the alternative, that the decrees did not authorize the promotion of black applicants ahead of higher scoring white applicants and thus did not justify race-conscious promotions. App. 281–282. The City, on the other hand, contended that the promotions were immunized from challenge if they were either required or permitted by the terms of the decrees. *Id.*, at 282. The District Court took the intermediate position that promotions required by—and made because of—the decrees were justified.[15] However, it denied the City's summary judgment motion because it raised factual issues requiring a trial. *Id.*, at 288–289.

In December 1985, the court conducted a 5-day trial limited to issues concerning promotions in the City's fire and engineering departments.[16] At that trial, respondents chal-

---

[15] The court indicated that if the race-conscious promotions were a product of the City's adherence to pending court orders (*i. e.*, the consent decrees), it could not be said that the City acted with the requisite racially discriminatory intent. See *id.*, at 280 ("[T]he court is persuaded that the defendants can . . . defend these reverse discrimination claims if they establish that the challenged promotions were made because of the requirements of the consent decree"). See also Tr. (May 14, 1984), reprinted in App. 237. In reaching this conclusion, the District Court was well aware of the Court of Appeals' previous suggestion that such a defense might be available:

"'The consent decree would only become an issue if the defendant attempted to justify its conduct by saying that it was mandated by the consent decree. If this were the defense, the trial judge would have to determine whether the defendant's action was mandated by the decree, and, if so, whether that fact alone would relieve the defendant of liability that would otherwise attach. This is, indeed, a difficult question. . . . We should not, however, preclude potentially wronged parties from raising such a question merely because it is perplexing.'" App. 280–281, n. 6, quoting *United States* v. *Jefferson County*, 720 F. 2d, at 1518–1519.

[16] At the close of the plaintiffs' case, the District Court granted the motion of the Board to dismiss the claims against it pursuant to Federal Rule

lenged the validity of the consent decrees; to meet that challenge, petitioners introduced the records of the 1976 trial, the 1979 trial, and the fairness hearing conducted in 1981. Respondents also tried to prove that they were demonstrably better qualified than the black firefighters who had been promoted ahead of them. At the conclusion of the trial, the District Court entered a partial final judgment dismissing portions of the plaintiffs' complaints. The judge explained his ruling in an oral opinion dictated from the bench, supplemented by the adoption, with some changes, of detailed findings and conclusions drafted by the prevailing parties. See App. to Pet. for Cert. 27a, 37a.

In his oral statement, the judge adhered to the legal position he had expressed in his February ruling. He stated:

"The conclusions there expressed either explicitly or implicitly were that under appropriate circumstances, a valid consent decree appropriately limited can be the basis for a defense against a charge of discrimination, even in the situation in which it is clear that the defendant to the litigation did act in a racially conscious manner.

"In that February order, it was my view as expressed then, that if the City of Birmingham made promotions of blacks to positions as fire lieutenant, fire captain and civil engineer, because the City believed it was required to do so by the consent decree, and if in fact the City was required to do so by the Consent Decree, then they would not be guilty of racial discrimination, either

---

of Civil Procedure 41(b). The basis for the motion was the fact that, even without regard to the consent decrees, the plaintiffs had not proved a prima facie case against the Board, which had done nothing more than provide the City with the names of employees, both white and black, who were qualified for promotion. There was no evidence that the Board's certification process, or its testing procedures, adversely affected whites. I am at a loss to understand why the Court of Appeals did not affirm the judgment in favor of the Board.

under Title 7, Section 1981, 1983 or the 14th Amendment. That remains my conclusion given the state of the law as I understand it." *Id.*, at 77a.

He then found as a matter of fact that petitioners had not promoted any black officers who were not qualified or who were demonstrably less qualified than the whites who were not promoted. He thus rejected respondents' contention that the City could not claim that it simply acted as required by terms of the consent decree:[17]

"In this case, under the evidence as presented here, I find that even if the burden of proof be placed on the defendants, they have carried that proof and that burden of establishing that the promotions of the black individuals in this case were in fact required by the terms of the consent decree." *Id.*, at 78a.

The written conclusions of law that he adopted are less clear than his oral opinion. He began by unequivocally stating: "The City Decree is lawful."[18] *Id.*, at 106a. He explained that "under all the relevant case law of the Eleventh Circuit and the Supreme Court, it is a proper remedial device, designed to overcome the effects of prior, illegal discrimination by the City of Birmingham."[19] *Id.*, at 106a–

---

[17] Paragraph 2 of the City decree provides, in pertinent part:
"Nothing herein shall be interpreted as requiring the City to . . . promote a person who is not qualified . . . or promote a less qualified person, in preference to a person who is demonstrably better qualified based upon the results of a job related selection procedure." App. to Pet. for Cert. 124a.

[18] The District Court's opinion does not refer to the second consent decree because the claims against the Board had been dismissed at the end of the plaintiffs' case. See n. 16, *supra*.

[19] In support of this proposition, the court cited, *inter alia*, our decision in *Steelworkers* v. *Weber*, 443 U. S. 193 (1979). We recently reaffirmed the *Weber* decision in *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616 (1987). See also *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421 (1986) (plurality opinion); *id.*, at 483 (Powell, J., concurring in part and concurring in judgment); *id.*, at 489 (O'CONNOR, J., concurring in part and dissenting in part); *id.*, at 499 (WHITE, J., dissenting) (all re-

107a. In that same conclusion, however, he did state that "plaintiffs cannot collaterally attack the Decree's validity." *Id.*, at 106a. Yet, when read in context—and particularly in light of the court's finding that the decree was lawful under Eleventh Circuit and Supreme Court precedent—it is readily apparent that, at the extreme, this was intended as an alternative holding. More likely, it was an overstatement of the rule that collateral review is narrower in scope than appellate review. In any event, and regardless of one's reading of this lone sentence, it is absolutely clear that the court did not hold that respondents were bound by the decree. Nowhere in the District Court's lengthy findings of fact and conclusions of law is there a single word suggesting that respondents were bound by the consent decree or that the court intended to treat them as though they had been actual parties to that litigation and not merely as persons whose interests, as a practical matter, had been affected. Indeed, respondents, the Court of Appeals, and the majority opinion all fail to draw attention to any point in these cases' long history at which the judge may have given the impression that any nonparty was legally bound by the consent decree.[20]

---

affirming that courts are vested with discretion to award race-conscious relief).

[20] In *Provident Tradesmens Bank & Trust Co.* v. *Patterson*, 390 U. S., at 114, we expressly did not decide whether a litigant might "be bound by [a] previous decision because, although technically a nonparty, he had purposely bypassed an adequate opportunity to intervene." See Note, Preclusion of Absent Disputants to Compel Intervention, 79 Colum. L. Rev. 1551 (1979) (arguing in favor of such a rule of mandatory intervention); 7 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1608, p. 115, n. 33 (2d ed. 1986) (drawing a parallel between the mandatory intervention rule and this Court's decision in *Penn-Central Merger and N & W Inclusion Cases*, 389 U. S. 486 (1968)). Today, the Court answers this question, at least in the limited context of the instant dispute, holding that "[j]oinder as a party [under Federal Rule of Civil Procedure 19], rather than knowledge of a lawsuit and an opportunity to intervene [under Federal Rule of Civil Procedure 24], is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or de-

## II

Regardless of whether the white firefighters were parties to the decrees granting relief to their black co-workers, it would be quite wrong to assume that they could never collaterally attack such a decree. If a litigant has standing, he or she can always collaterally attack a judgment for certain narrowly defined defects. See, *e. g.*, *Klapprott* v. *United States*, 335 U. S. 601 (1949); and cases cited in n. 5, *supra*. See also *Korematsu* v. *United States*, 584 F. Supp. 1406 (ND Cal. 1984) (granting writ of *coram nobis* vacating conviction based on Government concealment of critical contradictory evidence in *Korematsu* v. *United States*, 323 U. S. 214 (1944)). On the other hand, a district court is not required to retry a case—or to sit in review of another court's judgment—every time an interested nonparty asserts that *some* error that might have been raised on direct appeal was committed. See nn. 6 and 8, *supra*. Such a broad allowance of collateral review would destroy the integrity of litigated judgments, would lead to an abundance of vexatious litigation, and would subvert the interest in comity between courts.[21] Here, respondents have offered no circumstance

---

cree." *Ante*, at 765. See also *ante*, at 763 ("[A] party seeking a judgment binding on another cannot obligate that person to intervene; he must be joined"). Because I conclude that the District Court did not hold that respondents were bound by the consent decrees, I do not reach this issue.

[21] One leading commentator relies on the following poignant language employed by the Virginia Supreme Court to explain the significance of the doctrine limiting collateral attacks:

"'It is one . . . which has been adopted in the interest of the peace of society and the permanent security of titles. If, after the rendition of a judgment by a court of competent jurisdiction, and after the period has elapsed when it becomes irreversible for error, another court may in another suit inquire into the irregularities or errors in such judgment, there would be no end to litigation and no fixed established rights. A judgment, though unreversed and irreversible, would no longer be a final adjudication of the rights of the litigants, but the starting point from which a new litigation would spring up; acts of limitation would become useless and nugatory; purchasers on the faith of judicial process would find no protection; every

that might justify reopening the District Court's settled judgment.

The implementation of a consent decree affecting the interests of a multitude of nonparties, and the reliance on that decree as a defense to a charge of discrimination in hiring and promotion decisions, raise a legitimate concern of collusion. No such allegation, however, has been raised. Moreover, there is compelling evidence that the decrees were not collusive. In its decision approving the consent decrees over the objection of the BFA and individual white firefighters, the District Court observed that there had been "no contention or suggestion" that the decrees were fraudulent or collusive. 28 FEP Cases, at 1835. The record of the fairness hearing was made part of the record of this litigation, and this finding was not contradicted. More significantly, the consent decrees were not negotiated until after the 1976 trial and the court's finding that the City had discriminated against black candidates for jobs as police officers and firefighters, see App. 553, and until after the 1979 trial, at which substantial evidence was presented suggesting that the City also discriminated against black candidates for promotion in the fire department, see n. 12, *supra*. Like the record of the 1981 fairness hearing, the records of both of these prior proceed-

---

right established by a judgment would be insecure and uncertain; and a cloud would rest upon every title.'" 1 H. Black, Law of Judgments § 245, pp. 365–366 (2d ed. 1902), quoting *Lancaster* v. *Wilson*, 27 Gratt. 624, 629 (Va. 1876).

In addition to undermining this interest in finality, permitting collateral attacks also leads to the anomaly that courts will, on occasion, be required to sit in review of judgments entered by other courts of equal—or even greater—authority. Cf. *ASARCO Inc.* v. *Kadish, ante,* at 622–623; *District of Columbia Court of Appeals* v. *Feldman,* 460 U. S. 462 (1983); *Rooker* v. *Fidelity Trust Co.,* 263 U. S. 413, 415–416 (1923). The rule is also supported by the fact that there is no assurance that a second round of litigation is more likely than the first to reach a just result or obtain uniformity in the law.

ings were made part of the record in these cases. Given this history, the lack of any indication of collusion, and the District Court's finding that "there is more than ample reason for . . . the City of Birmingham to be concerned that [it] would be in time held liable for discrimination against blacks at higher level positions in the police and fire departments," 28 FEP Cases, at 1838, it is evident that the decrees were a product of genuine arm's-length negotiations.

Nor can it be maintained that the consent judgment is subject to reopening and further litigation because the relief it afforded was so out of line with settled legal doctrine that it "was transparently invalid or had only a frivolous pretense to validity." [22] *Walker* v. *Birmingham*, 388 U. S. 307, 315 (1967) (suggesting that a contemner might be allowed to challenge contempt citation on ground that underlying court order was "transparently invalid"). To the contrary, the type of race-conscious relief ordered in the consent decrees is entirely consistent with this Court's approach to affirmative action. Given a sufficient predicate of racial discrimination, neither the Equal Protection Clause of the Fourteenth Amendment [23] nor Title VII of the Civil Rights Act

---

[22] It was argued during the 1981 fairness hearing, in the first complaint filed in this litigation, see App. to Pet. for Cert. 113a, and in at least one of the subsequently filed complaints, see App. 96, that race-conscious relief for persons who are not proven victims of past discrimination is absolutely prohibited by the Equal Protection Clause of the Fourteenth Amendment and by Title VII of the Civil Rights Act of 1964. As I have pointed out, the *Wilks* complaint did not challenge the validity of the decrees. See App. 135–137.

[23] See *Wygant* v. *Jackson Bd. of Education*, 476 U. S. 267, 286 (1986) (O'CONNOR, J., concurring in part and concurring in judgment) ("The Court is in agreement that, whatever the formulation employed, remedying past discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program"). See also *Sheet Metal Workers*, 478 U. S., at 479–481 (plurality opinion); *id.*, at 484–489 (Powell, J., concurring in part and concurring in judgment).

of 1964[24] erects a bar to affirmative-action plans that benefit nonvictims and have some adverse effect on nonwrongdoers.[25] As JUSTICE O'CONNOR observed in *Wygant* v.

[24] In distinguishing the Court's decision in *Firefighters* v. *Stotts*, 467 U. S. 561 (1984), the plurality in *Sheet Metal Workers*, 478 U. S., at 474–475, asserted:

"However, this limitation on *individual* make-whole relief does not affect a court's authority to order race-conscious affirmative action. The purpose of affirmative action is not to make identified victims whole, but rather to dismantle prior patterns of employment discrimination and to prevent discrimination in the future. Such relief is provided to the class as a whole rather than to individual members; no individual is entitled to relief, and beneficiaries need not show that they were themselves victims of discrimination. In this case, neither the membership goal nor the Fund order required petitioners to indenture or train particular individuals, and neither required them to admit to membership individuals who were refused admission for reasons unrelated to discrimination. We decline petitioners' invitation to read *Stotts* to prohibit a court from ordering any kind of race-conscious affirmative relief that might benefit nonvictims. This reading would distort the language of § 706(g), and would deprive the courts of an important means of enforcing Title VII's guarantee of equal employment opportunity."

See also *id.*, at 483 (Powell, J., concurring in part and concurring in judgment) ("plain language of Title VII does not clearly support a view that all remedies must be limited to benefiting victims," and "although the matter is not entirely free from doubt," the legislative history of Title VII indicates that nonvictims may be benefited); *id.*, at 490 (O'CONNOR, J., concurring in part and dissenting in part) ("It is now clear . . . that a majority of the Court believes that the last sentence of § 706(g) does not in all circumstances prohibit a court in a Title VII employment discrimination case from ordering relief that may confer some racial preferences with regard to employment in favor of nonvictims of discrimination"); *id.*, at 499 (WHITE, J., dissenting) ("I agree that § 706(g) does not bar relief for nonvictims in all circumstances").

[25] In my view, an affirmative-action plan need not be supported by a predicate of racial discrimination by the employer provided that the plan "serve[s] a valid public purpose, that it was adopted with fair procedures and given a narrow breadth, that it transcends the harm to [the nonminority employees], and that it is a step toward that ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race." *Wygant*, 476 U. S., at 320 (STEVENS, J., dissent-

*Jackson Bd. of Education*, 476 U. S. 267 (1986): "This reme-
dial purpose need not be accompanied by contemporaneous
findings of actual discrimination to be accepted as legitimate
as long as the public actor has a firm basis for believing that
remedial action is required." *Id.*, at 286 (opinion concurring
in part and concurring in judgment). Such a belief was
clearly justified in these cases. After conducting the 1976
trial and finding against the City and after listening to the
five days of testimony in the 1979 trial, the judge was well
qualified to conclude that there was a sound basis for believ-
ing that the City would likely have been found to have vio-
lated Title VII if the action had proceeded to a litigated
judgment.[26]

Hence, there is no basis for collaterally attacking the judg-
ment as collusive, fraudulent, or transparently invalid.
Moreover, respondents do not claim—nor has there been any
showing of—mistake, duress, or lack of jurisdiction. In-
stead, respondents are left to argue that somewhat different
relief would have been more appropriate than the relief that
was actually granted. Although this sort of issue may pro-
vide the basis for a direct appeal, it cannot, and should not,
serve to open the door to relitigation of a settled judgment.

---

ing). In these cases, however, the plan was undoubtedly preceded by an
adequate predicate of racial discrimination; thus, I need not consider
whether there is some present-day purpose that might justify a race-
conscious promotion scheme.

[26] Moreover, the District Court, in its opinion approving the consent de-
crees, found that the remedies are "reasonably commensurate with the
nature and extent of the indicated discrimination," are "limited in duration,
expiring as particular positions generally reflect the racial . . . composition
of the labor market in the county as a whole," allow for "substantial oppor-
tunity for employment advancement of whites and males," and "do not re-
quire the selection of blacks . . . who are unqualified or who are
demonstrably less qualified than their competitors." 28 FEP Cases 1834,
1838 (ND Ala. 1981). Therefore, it cannot be claimed that the court failed
to consider whether the remedies were tailored "to fit the nature of the vio-
lation." *Sheet Metal Workers*, 478 U. S., at 476. See also *id.*, at 496
(O'CONNOR, J., concurring in part and dissenting in part).

## III

The facts that respondents are not bound by the decrees, and that they have no basis for a collateral attack, moreover, do not compel the conclusion that the District Court should have treated the decrees as nonexistent for purposes of respondents' discrimination suit. That the decrees may not directly interfere with any of respondents' legal rights does not mean that they may not affect the factual setting in a way that negates respondents' claim. The fact that a criminal suspect is not a party to the issuance of a search warrant does not imply that the presence of a facially valid warrant may not be taken as evidence that the police acted in good faith. See *Malley* v. *Briggs*, 475 U. S. 335, 344–345 (1986); *United States* v. *Leon*, 468 U. S. 897, 921–922, 924 (1984); *United States* v. *Ross*, 456 U. S. 798, 823, n. 32 (1982). Similarly, the fact that an employer is acting under court compulsion may be evidence that the employer is acting in good faith and without discriminatory intent. Cf. *Ashley* v. *City of Jackson*, 464 U. S. 900, 903 (1983) (REHNQUIST, J., dissenting from denial of certiorari) (suggesting that compliance with a consent decree "might be relevant to a defense of good-faith immunity"); Restatement (Second) of Judgments § 76, Comment *a*, p. 217 (1982) ("If the judgment is held to be not binding on the person against whom it is invoked, it is then ignored in the determination of matters in issue in the subsequent litigation, unless it is relevant for some other purpose such as proving the good faith of a party who relied on it"). Indeed, the threat of a contempt citation provides as good a reason to act as most, if not all, other business justifications.[27]

---

[27] Because consent decrees "have attributes both of contracts and judicial decrees," they are treated differently for different purposes. *United States* v. *ITT Continental Baking Co.*, 420 U. S. 223, 236, n. 10 (1975). See also *Firefighters* v. *Cleveland*, 478 U. S., at 519. For example, because the content of a consent decree is generally a product of negotiations between the parties, decrees are construed for enforcement purposes as contracts. See *ITT Continental Baking Co.*, *supra*, at 238; *Stotts* v.

After reviewing the evidence, the District Court found that the City had in fact acted under compulsion of the consent decrees. App. to Pet. for Cert. 107a; *In re Birmingham Reverse Discrimination Employment Litigation*, 36 EPD ¶ 35022, p. 36,586 (ND Ala. 1985). Based on this finding, the court concluded that the City carried its burden of coming forward with a legitimate business reason for its promotion policy, and, accordingly, held that the promotion decisions were "not taken with the requisite discriminatory intent" necessary to make out a claim of disparate treatment under Title VII or the Equal Protection Clause. App. to Pet. for Cert. 107a, citing *United States* v. *Jefferson County*, 720 F. 2d, at 1518. For this reason, and not because it thought that respondents were legally bound by the consent decrees, the court entered an order in favor of the City and defendant-intervenors.

Of course, in some contexts a plaintiff might be able to demonstrate that reference to a consent decree is pretextual. See *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248 (1981). For example, a plaintiff might be able to show that the consent decree was collusive and that the defendants simply obtained the court's rubber stamp on a private agreement that was in no way related to the eradication of pervasive racial discrimination. The plaintiff, alternatively, might be able to show that the defendants were not bound to obey the consent decree because the court that entered it was without jurisdiction. See *United States* v. *Mine*

*Memphis Fire Dept.*, 679 F. 2d 541, 557 (CA6 1982), rev'd on other grounds, 467 U. S. 561 (1984). For purposes of determining whether an employer can be held liable for intentional discrimination merely for complying with the terms of a consent decree, however, it is appropriate to treat the consent decree as a judicial order. Unlike the typical contract, a consent decree, such as the ones at issue here, is developed in the context of adversary litigation. Moreover, the court reviews the consent decree to determine whether it is lawful, reasonable, and equitable. In placing the judicial *imprimatur* on the decree, the court provides the parties with some assurance that the decree is legal and that they may rely on it. Most significantly, violation of a consent decree is punishable as criminal contempt. See 18 U. S. C. §§ 401, 402; Fed. Rule Crim. Proc. 42.

*Workers*, 330 U. S. 258, 291–294 (1947). Similarly, although more tenuous, a plaintiff might argue that the parties to the consent judgment were not bound because the order was "transparently invalid" and thus unenforceable.[28] If the defendants were as a result not bound to implement the affirmative-action program, then the plaintiff might be able to show that the racial preference was not a product of the court order.

In a case such as these, however, in which there has been no showing that the decree was collusive, fraudulent, transparently invalid, or entered without jurisdiction, it would be "unconscionable" to conclude that obedience to an order remedying a Title VII violation could subject a defendant to additional liability. Cf. *Farmers* v. *WDAY, Inc.*, 360 U. S. 525, 531 (1959). Rather, all of the reasons that support the Court's view that a police officer should not generally be held liable when he carries out the commands in a facially valid warrant apply with added force to city officials, or indeed to private employers, who obey the commands contained in a decree entered by a federal court.[29] In fact, Equal Employ-

---

[28] In *Walker* v. *Birmingham*, 388 U. S. 307 (1967), we held that a party can be held in contempt of court for violating an injunction, even if the injunction was invalid under the Federal Constitution. However, in upholding the contempt citations at issue, we made clear that that was "not a case where the injunction was transparently invalid or had only a frivolous pretense to validity." *Id.*, at 315. Courts and commentators have relied on this reservation in positing that a contempt citation may be collaterally attacked if the underlying order was "transparently invalid." See, *e. g.*, *In re Providence Journal Co.*, 820 F. 2d 1342 (CA1 1986), cert. dism'd *sub nom. United States* v. *Providence Journal*, 485 U. S. 693 (1988); 3 C. Wright, Federal Practice and Procedure § 702, p. 815, n. 17 (2d ed. 1982).

[29] Both warrants and consent decrees bear the indicium of reliability that a judicial officer has reviewed the proposed act and determined that it is lawful. See *United States* v. *Alexandria*, 614 F. 2d 1358, 1361 (CA5 1980) ("trial court must satisfy itself that the consent decree is not unlawful, unreasonable, or inequitable before it can be approved"); App. to Pet. for Cert. 238a. Unlike the police officer in receipt of a facially valid warrant, however, an employer with notice of an affirmative injunction has no choice

ment Opportunity Commission regulations concur in this assessment. They assert: "The Commission interprets Title VII to mean that actions taken pursuant to the direction of a Court Order cannot give rise to liability under Title VII." 29 CFR § 1608.8 (1989).[30] Assuming that the District Court's findings of fact were not clearly erroneous—which of course is a matter that is not before us—it seems perfectly clear that its judgment should have been affirmed. Any other conclusion would subject large employers who seek to comply with the law by remedying past discrimination to a never-ending stream of litigation and potential liability. It is unfathomable that either Title VII or the Equal Protection Clause demands such a counterproductive result.

## IV

The predecessor to this litigation was brought to change a pattern of hiring and promotion practices that had discriminated against black citizens in Birmingham for decades. The white respondents in these cases are not responsible for that history of discrimination, but they are nevertheless beneficiaries of the discriminatory practices that the litigation was designed to correct. Any remedy that seeks to create employment conditions that would have obtained if there had been no violations of law will necessarily have an adverse impact on whites, who must now share their job and promotion op-

---

but to act. This added element of compulsion renders imposition of liability for acting pursuant to a valid consent decree all the more inequitable.

[30] Section 1608.8 does not differentiate between orders "entered by consent or after contested litigation." 29 CFR § 1608.8 (1989). Indeed, the reasoning in the Court's opinion today would seem equally applicable to litigated orders and consent decrees.

The Court's unwillingness to acknowledge that the grounds for a collateral attack on a judgment are significantly narrower than the grounds available on direct review, see *ante*, at 765, n. 6, is difficult to reconcile with the host of cases cited in *United States* v. *Frady*, 456 U. S., at 165, the cases cited in n. 6, *supra*, and those cited in the scholarly writings cited in n. 5, *supra*.

portunities with blacks.[31] Just as white employees in the past were innocent beneficiaries of illegal discriminatory practices, so is it inevitable that some of the same white employees will be innocent victims who must share some of the burdens resulting from the redress of the past wrongs.

There is nothing unusual about the fact that litigation between adverse parties may, as a practical matter, seriously impair the interests of third persons who elect to sit on the sidelines. Indeed, in complex litigation this Court has squarely held that a sideline-sitter may be bound as firmly as an actual party if he had adequate notice and a fair opportunity to intervene and if the judicial interest in finality is sufficiently strong. See *Penn-Central Merger and N & W Inclusion Cases*, 389 U. S. 486, 505–506 (1968). Cf. *Bergh* v. *Washington*, 535 F. 2d 505, 507 (CA9), cert. denied, 429 U. S. 921 (1976); *Safir* v. *Dole*, 231 U. S. App. D. C. 63, 70–71, 718 F. 2d 475, 482–83 (1983), cert. denied, 467 U. S. 1206 (1984); James & Hazard § 11.31, pp. 651–652.

There is no need, however, to go that far in order to agree with the District Court's eminently sensible view that compliance with the terms of a valid decree remedying violations of Title VII cannot itself violate that statute or the Equal Protection Clause.[32] The city of Birmingham, in entering into

---

[31] It is inevitable that nonminority employees or applicants will be less well off under an affirmative-action plan than without it, no matter what form it takes. For example, even when an employer simply agrees to recruit minority job applicants more actively, white applicants suffer the "nebulous" harm of facing increased competition and the diminished likelihood of eventually being hired. See Schwarzchild, Public Law By Private Bargain: Title VII Consent Decrees and the Fairness of Negotiated Institutional Reform, 1984 Duke L. J. 887, 909–910.

[32] In professing difficulty in understanding why respondents are not "bound" by a decree that provides a defense to employment practices that would otherwise violate Title VII, see *ante*, at 765, n. 6, the Court uses the word "bound" in a sense that is different from that used earlier in its opinion. A judgment against an employer requiring it to institute a seniority system may provide the employer with a defense to employment practices that would otherwise violate Title VII. In the sense in which the

and complying with this decree, has made a substantial step toward the eradication of the long history of pervasive racial discrimination that has plagued its fire department. The District Court, after conducting a trial and carefully considering respondents' arguments, concluded that this effort is lawful and should go forward. Because respondents have thus already had their day in court and have failed to carry their burden, I would vacate the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion.

---

word "bound" is used in the cases cited by the Court, *ante*, at 761–762 of its opinion, only the parties to the litigation would be "bound" by the judgment. But employees who first worked for the company 180 days after the litigation ended would be "bound" by the judgment in the sense that the Court uses when it responds to my argument. The cases on which the Court relies are entirely consistent with my position. Its facile use of the word "bound" should not be allowed to conceal the obvious flaws in its analysis.