DeMOSS, Circuit Judge,
dissenting:
With some of the trepidation that I suspect was in the mind of David when he stepped *1120 forward to face Goliath, I write to express my dissent and disagreement with the analysis and conclusions reached by my distinguished colleagues in the foregoing opinion.
I disagree with the panel majority’s extrapolation from the record that the district judge denied the motions for intervention because of “untimeliness.” In my view, if the district judge articulated any reason for his denial of the motions for intervention, it was because he felt that the right to object at the fairness hearing was all he was obligated to afford to the would-be intervenors.
I dissent and disagree with the majority panel conclusion that the district judge’s denial of the motion for intervention because of “untimeliness” was not clearly erroneous. In my view, such a ruling is clearly inconsistent with and not supported by any prior case law nor by an appropriate construction of the newly adopted amendment to the Civil Rights Act which speaks to this question.
I dissent and disagree with the panel majority’s conclusion that denial of a motion to intervene “for appeal only” is a final judgment which vests this court with appellate jurisdiction, when a prior motion to intervene in the main case has been denied and sustained on appeal by the court. In my view, there is nothing in the Federal Rules of Civil Procedure which contemplates a motion at the trial court level to intervene for appeal purposes only and there is nothing in the newly enacted amendment to the Civil Rights Act which evidences an intention to create an appeal from the fairness hearing.
Some history is necessary to put this case and my dissent in perspective. Prior to the Supreme Court’s decision in Martin v. Wilks, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), most federal courts of appeal had adopted a very restrictive rule precluding all challenges or collateral attacks on a Title VII consent decree once it had been entered by a court.[1] These courts concluded (i) that the effectiveness of such decrees as a mechanism to settle claims short of or early in the litigation process would be substantially undermined, if not eliminated, if the decrees were subject to perpetual challenge; and (ii) that such decrees have played a beneficial role in providing relief to thousands of victims of systemic employment discrimination.[2] However, in Wilks, the Supreme Court, in rejecting the “impermissible collateral attack doctrine” of the circuit courts, found that (i) one of the clear principles of Anglo-American jurisprudence is “that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process;” (ii) that one of the rules deeply rooted in our historic tradition is “that everyone should have his own day in court;” and (iii) that the law does not impose on anyone the burden of voluntary intervention in a suit to which he is a stranger; and that “[ujnless duly summoned to appear in a legal proceeding, a person not a privy may rest assured that a judgment recovered therein will not affect his legal rights.” Wilks, 490 U.S. at 762, 109 S.Ct. at 2184-85. As the Supreme Court recognized, both FRCP 24(a) covering intervention as a matter of right, and 24(b) covering permissive intervention, are cast in “permissive terms.”[3] Concerns for finality and completeness of judgments are “better [served] by [the] mandatory join-der procedures” set forth in Rule 19(a). Id. Finally, “the linchpin of the ‘impermissible collateral attack doctrine’ — the attribution of preclusive effect to a failure to intervene — is therefore quite inconsistent with Rule 19 and Rule 24.” Id. at 764, 109 S.Ct. at 2186.
The U.S. Congress, however, concluded that the Supreme Court had gone too far in Wilks, which in effect required mandatory joinder of all parties whose interests could potentially be affected, and the Congress therefore set upon the task of devising a *1121 remedial scheme which would “balance the rights of non-litigants against the need for finality of judgments and prompt relief for discrimination.” H.R.Rep. No. 40(1), 102d Cong. (1991), reprinted in, 137 Cong.Rec. 588 (1991), U.S.Code Cong. & Admin.News 1991, 549, 588. That balance is best achieved when all interested parties are allowed to participate in a single proceeding. As the Judiciary Committee stated:
[T]he Wilks decision imposes inefficient and inequitable rules on Title VII litigation. Once an employment dispute has reached the courts, the parties, all non-litigants with a stake in its outcome, and the public have a strong interest in bringing the litigation to an expeditious end. Thus, all related interests and claims should ordinarily be adjudicated in one proceeding, (emphasis added). H.R.Rep. No. 40(1), 102d Cong., reprinted in 137 Cong.Rec. 591 (1991), U.S.Code Cong. & Admin.News 1991, 591.
To accomplish this goal Congress passed Public Law 102-166, Section 108, which is now codified at 42 U.S.C. § 2000e-2(n) and became effective January 21, 1991.
Subsection n(l) defines the circumstances under which subsequent challenges to a consent decree will be precluded. It is similar in content to the pre-Wilks case law, although it imposes some new requirements (i.e., “actual notice of the proposed judgment”) which were not requirements of that prior law.
Subsection n(2) sets forth the various circumstances in which subsequent attack on a Title VII consent decree will not be precluded. Congress expressly stated its intent to include all relevant parties in Subsection n(2)(A) which provides that nothing in the Subsection is intended to “alter the standards for intervention under Rule 24.” Although the majority opinion makes no mention of the effect these amendments, I believe that we should reconcile and address their effect on this suit.
With this general legal background in mind, I need to add some comments about this particular lawsuit. It is a “disparate impact ease” and not an “intentional discrimination case.” It was filed August 19, 1992. As the majority opinion indicates, two previously existing lawsuits, Kelly and Comeaux were consolidated into this case. Kelly, filed in 1975, and Comeaux, filed in 1976, both included assertions of disparate impact similar to these in the current case. The City of Houston filed an answer in this case on September 30, 1992, and denied generally the allegations of disparate impact in this case, just as it had done in the prior cases of Kelly and Comeaux. The disparate impact is alleged to . occur “in racially discriminatory promotional examinations for the ranks of sergeant and lieutenant in the Houston Police Department.” The plaintiffs sought certifi-’ cation by the trial court of two classes of plaintiffs, African American and Hispanic American members of the police department who took examinations for sergeant and lieutenant during the years in question. As I understand the record, the process for promotion in the Houston Police Department consists of the following steps:
1. The police officers who have served a defined number of years in a lower grade are eligible to take the examination for promotion to a higher grade.
2. The officers who take and pass the promotional examination with at least the established passing grade are eligible for promotion.
3. All eligible officers are then placed in rank order on a list of those eligible for promotion in accordance with the sum of:
a. their actual score on that examination, plus
b. additional points, based on their years of service with the police department.
4. As vacancies occur (resulting from death, withdrawal, retirement, resignation, or from expansion of the force by action of the City Council) these vacancies are filled from the top of the list of eligibles downward until all vacancies are filled.
This system produces the following general results:
1. Individual police officers who make the highest scores on the examination and *1122 have the largest number of points for years of service are the first ones to be promoted; and
2. The number of promotions actually made is a function of the number of vacancies and not the number of eligi-bles on the list.
The plaintiffs tendered various statistical studies which showed that comparing “test" takers” and “numbers of promotions” for each of the categories of whites, blacks, and hispanics, there was a variation in promotion rates for blacks and hispanics sufficiently large to rule out chance as the determining factor, and therefore there was an adverse discriminatory impact. This adverse impact was attributed by plaintiffs to certain questions (not identified either by number or by content) on the examinations, which blacks and hispanics were alleged to have answered incorrectly more frequently than whites. However, in my judgment, the theory upon which the plaintiffs plead and supported their claims (as indicated by paragraphs 24-39 of the findings of fact and conclusions of law which the plaintiffs prepared and persuaded the trial judge to sign in this case) suffer two fundamental conceptual breakdowns which render their claims questionable:
A. First of all, to prove “disparate impact” in the giving and taking of an examination, one must compare “test takers” and “test passers.” Not only did the plaintiffs not proffer any statistical testimony based on this comparison, they alibied out of the task (and got the district court to sign a finding) on the grounds that the expense of making such a determination was prohibitive.
B. Secondly, to prove “disparate impact” in the promotion system used by the city, you must compare the number of individuals eligible for promotion with the number of individuals actually promoted in each of the racial categories.
As I explained earlier, to be eligible for promotion, each police officer, of all racial categories, must achieve the same minimum score; and it is important to note in this case that there is no contention that the minimum passing score for blacks and/or hispanics was any different from that for whites. But in their statistical data, for purposes of comparison with the actual promotions in each minority category, the plaintiffs utilize a concept of “availability” (the percentage of blacks and hispanics of all test takers) as the starting point for determining a concept of “expected promotions” (the number of minorities who would be promoted if you applied the “availability” percentage to the total number of actual promotions of all categories.) Clearly, in my judgment, the factor of “available percentage” should have been determined by determining the percentage of each minority category of all “test passers” (not test takers) and the number of “expected promotions” would then be the percentage attributable to each minority group which were eligible for promotions as applied to the total number of promotions actually made.
If the statistical data incorporated in the findings of fact was the same data presented to the City of Houston in the settlement negotiations, I am genuinely surprised that the city would buy into the fundamental premises of the plaintiffs’ case. Obviously, the city had faced similar “disparate impact” contentions in the Kelly and Comeaux cases for more than ten years, and had consistently declined to recognize the validity of such contentions. The net results of the plaintiffs’ claims and the city’s capitulation thereto, is a determination of a “short fall” in promotions to each of the minority groups and a determination to award “remedial promotions” to each of these minority groups on the basis of such “short fall.” There is, however, no evidence or findings which can determine any individual as to which these remedial promotions should be granted. In fact, under the consent decree, these promotions will be awarded to whomever the city chooses from among the two minority groups. I am deeply troubled by the decision of the city to use a consent decree from the federal court as a crutch to achieve that which it could not accomplish as a matter of its own independent decision making, i.e., expand the composition of the police department by 96 new sergeants slots and award those slots on the basis of race.
At about this point, various other groups of police officers sought to intervene in this *1123 case. Some of these groups are representative of other minorities, i.e., women and Asians. Others of these groups represent associations and unions of police officers. Some of these groups sought to intervene as plaintiffs, alleging that they too had been victims of “disparate impact” in the promotion process and that they should be entitled to share in the assignment of the new sergeant and lieutenant slots authorized by the city council. Other groups sought to intervene, in effect on the side of the City of Houston, as defendants, asserting that the examinations given for promotions were legitimate “job related” examinations, and consistent with the “business necessity” and professional desire to see that the most qualified individuals were promoted to positions of leadership. Some of these latter groups plead and proffered testimony that would show that the statistical data upon which plaintiffs contended “disparate impact” had occurred was flawed in concept or factually insupportable. And these contentions bring us to what I consider to be the “gut” issue in this lawsuit, i.e., “Did the trial court properly dispose of these motions to intervene?”
The trial court set a hearing to consider the motions to intervene. This hearing began at 9:30 a.m., continued without a recess, and concluded after generating only 65 pages of transcribed testimony. Approximately the first 30 pages of this transcription set forth a dialogue between the trial judge and plaintiffs’ counsel regarding the nature and content of plaintiffs’ asserted discrimination claims and the remedy provisions of some of the aspects of the proposed consent decree. About mid-way through the hearing, counsel for one of the would-be intervenors (the Houston Police Patrolmen’s Union) asked the court to direct its attention to the issue of intervention, which was the purpose of the hearing, and twice advised the court regarding the applicability of 42 U.S.C. § 2000e-2(n) as it relates to the subject of intervention. The trial court, however, ignored such references to subsection (n). Furthermore, at this hearing, supposedly on the subject of intervention, the court made no reference to Fed.R.Civ.P. 24(a), 24(b) or to any of the factors relating to the subject of intervention under those rules. There was no mention of the Stallworth case, nor the four factors for determining a question of timeliness thereunder. At the conclusion of the hearing, the court announced its ruling from the bench as follows:
The motions to intervene are denied without prejudice to them being reasserted after the objections are heard for purposes of appealing the decision itself as opposed to any ruling of the preparation of this issue, [sic]
Three days after the intervention hearing the district judge filed a “order on intervention” which read, in its entirety, as follows:
1. The motions to intervene in this case as full active parties representative by women, Asians, the airport police and park police, and by Houston Police Patrolmen’s Union and Park Police Association are denied.
2. The court will consider motions to intervene for purposes of appeal. These motions must be filed by April 19, 1993.
The district judge did not file any memorandum opinion supporting this “order on intervention.” Notices of appeal from the denial of the motions to intervene were timely filed within 30 days after the entry of such order. These notices of appeal were docketed under Appeal No. 93-2315 of this court.
As we begin the task of assessing the propriety of the trial court’s denial of the motion to intervene, and particularly the issue of “timeliness” which is at the heart of that determination, I think it is imperative to have a clear sense as to the procedural posture of the main case when the motions to intervene were filed. The intervention motions were essentially filed on or around March 12,1993. As of that date, the original parties, (i.e., the plaintiffs and the defendant City of Houston):
A. Had not filed any proposed order determining the class or classes to be certified pursuant to Rule 23(c) even though sub-part (1) of that rule states that such action would be taken “as soon as practicable after the commencement of an action brought as a class action;”
*1124 B. Had not entered into any scheduling order under Rule 16 establishing time tables for “joinder of parties, amendment of pleadings, or completion of discovery” as contemplated by that rule;
C. Had not engaged in any discovery activities or taken any deposition pursuant to notices filed under Rule 26;
D. Had not conducted any pretrial conferences for the purpose of establishing a trial date; and
E. Had not, obviously, undertaken any steps to implement any of the changes or procedures contemplated by the proposed consent decree.
As this court stated in Stallworth, “timeliness is not limited to chronological considerations but ‘is to be determined from all the circumstances.’ ” Stallworth v. Monsanto Co., 558 F.2d 257, 263 (1977) (quoting United States v. United States Steel Corp., 548 F.2d 1232, 1235 (1977)). Viewed in the light of “all the circumstances” I would say that this ease was still early in its normal procedural history and that there is no question that the motions to intervene were timely under “all the circumstances.” The City of Houston filed its answer on September 30, 1992, approximately 40 days after the plaintiffs filed their original petition. In that answer, the City of Houston, as defendant, denied the essential elements of the plaintiffs’ claim, called on the plaintiffs to prove “disparate impact,” and tendered proof by the city in support of the business necessity of the promotional examinations. The docket sheet of the court reflects absolutely no entries of any kind after September 30, 1992, until November 19,1992, when the parties filed a consent order on “confidentiality of documents,” which order was finally signed and filed on December 14, 1992. The next significant entry on the court’s docket was January 20, 1993, indicating a memorandum of a telephone conference which made arrangements for the preparation of a notice form to be sent out and established preliminary time tables for the return of objections and a pretrial conference. Consequently, for a period of almost four months, from the date of the city’s answer on September 30, 1992 to the entry of the conference memorandum on January 20, 1993, there were no docket entries on the registry of the court which would have given any third party who might be interested in the status of this case any real substantive clue as to what was going on. During this time, of course, the plaintiffs and the City of Houston initiated private settlement discussions (sometime in late November) and Chief Nuchia sent out his circular to the police department on December 16. {See n. 8 of majority opinion, supra.) However, it is evident from Chief Nuehia’s December 16th circular both that the consent decree was not a done deal and that the details had not been released. The panel majority attribute great significance to this December 16th circular which I am not inclined to give, primarily because of the tentative and preliminary nature of the information contained therein. But, even assuming that it was sufficient notice to start some “timeliness” clock ticking against the would-be interve-nors, the would-be intervenors took no more time to ultimately file their motions to intervene than it took the city and plaintiffs to arrive at some preliminary concept of a consent decree. The panel majority admits that this time interval by itself “would probably not merit a finding of untimeliness” but it nonetheless affirms the trial court by relying principally on the second and third factors of the Stallworth analysis.
Stallworth’s second factor relates to the prejudice which might result to existing parties. As Stallworth makes absolutely clear, such determination of prejudice as to existing parties is applicable primarily to motions for intervention under Rule 24(b) (permissive intervention) and has very limited application to motions for intervention under Rule 24(a). Stallworth, 558 F.2d at 265. This is because the language about prejudice to existing parties exists only in the language of Rule 24(b). Therefore, to take into account any prejudice that the existing parties may incur if intervention were allowed as part of the rubric of timeliness would be to rewrite Rule 24(a) by creating an additional prerequisite to intervention as of right. Id.
This is precisely what the majority does in their opinion. Amazingly they cite Corley v. Jackson Police Dep’t as authority for that *1125 conclusion. In Corley the motion to intervene was filed some four years after entry of the consent decree and after implementation of the consent decree, neither of which circumstances exist in this case. Corley v. Jackson Police Dep’t, 755 F.2d 1207 (5th Cir.1985). Furthermore, although the would-be intervenors in this ease sought to intervene under both Rule 24(a) and Rule 24(b), the majority does not even mention the distinction clearly established by Stallworth between those two rules on the subject of prejudice to the existing parties.[4]
Likewise, when we turn to Stallworth’s third and fourth timeliness factors, I think the trial judge and the panel majority completely missed the boat. The boat in this case is the significant impact which subsection (n) brings to the table of discussion about timeliness. The panel majority dismisses factor 4 by simply concluding that there were no unusual circumstances. As to factor 3 the panel majority concludes that the would-be intervenors “had their day in court,” stating, “there is no prejudice to the appellants [the would-be intervenors] because their participation in the fairness hearing in effect gave them all the rights they would have had they been made parties to the lawsuit.” The majority reaches this conclusion without even mentioning the language of subsection (n) which obviously prejudices the would-be appellant’s rights by foreclosing the possibility of subsequent challenge. Rather than sanction this result, Congress expressly tried to prevent it by encouraging inclusion of all interests in one proceeding. For example,
Subsection (n)(2)(A) states that the standards for intervention under Rule 24 are not “altered” by (n)(l)(B), regarding notice and an opportunity to present objections; and
subsection (n)(2)(A) also states that the rights of parties who have “successfully intervened,” pursuant to Rule 24, are not altered by (n)(l)(B).
In my view these provisions contemplate that intervention could occur in the proceeding in which the notice and opportunity to present objections would occur under (n)(l)(B), otherwise there would have been no need to include the second part of (n)(2)(A).
Finally I note that there is nothing in subsection (n) which speaks to the rights of parties who have been denied intervention; and there is nothing in subsection (n) which gives persons to whom notice and opportunity to present objections have been afforded under paragraph (1)(B) the right to appeal the entry of the judgment or order described in subparagraph (1)(A).
I submit that it is self evident from the face of the statute that the provisions for notice and an opportunity to present objections were not intended to take the place of intervention rights under Rule 24(a) or (b). If any legislative history is necessary to support this conclusion, I cite the following:
A person wishing to challenge an employment practice that implements a court decree will thus retain the right under Rule 24 to seek to intervene in the proceeding in which the decree was entered and, the court will determine whether intervention is appropriate through reference to the principles that have developed under Rule 24. Similarly, the preclusion rules do not apply to the rights of parties who successfully intervene pursuant to Rule 24. H.R.Rep. 40(1), 102d Cong. (1991), reprinted in, 137 Cong.Rec. 597 (1991), U.S.Cong. & Admin.News 1991, 597.
Furthermore, in the same legislative history, the house committee report states as follows:
They [the provisions regarding notice and a reasonable opportunity to be heard] advance the important goal of judicial finality by permitting all interests affected by a Title VII consent decree to be considered fully and fairly in a single proceeding, pri- or to entry of the decree. These provisions also embody the principle that third *1126 parties are best left to decide for themselves (after receiving sufficient notice) whether to enter pending litigation, rather than being forcibly joined, regardless of their wishes or intentions, as the Wilks rule requires. Id. at 594 (emphasis added).
Finally, the legislators specified that subsection (n) provides for the inclusion “of all reasonably ascertainable interested parties in a single proceeding” and precludes subsequent challenges “only where preclusion is consistent with due process.” Id. at 597.
Given the plain language of the statute and this legislative history, I submit that subsection (n) affords an individual who has received actual notice of a consent decree which might adversely affect his interests, three options. They are:
A. He may do nothing, in which event he will be precluded from challenging the judgment or order;
B. He may elect to present his objections on or before the date set by the notice, in which event he has no right to appeal from whatever disposition the court makes of his objections, and he will be precluded from challenging the judgment ultimately entered; or
C. He may move to intervene in the proceeding, in which event one or the other of the following results may occur:
1. If his motion to intervene is granted, he would be granted all of the rights of a normal party litigant therein, would not be precluded from asserting his rights under the Constitution or Federal Civil Rights Laws, would be afforded the right to appeal from the final judgment therein, and would be bound by principles of res judicata to the final judgment established therein; or
2. If his motion to intervene is denied, he would have the right to appeal such denial as may be afforded under Rule 24; and he may elect to participate or not participate in the opportunity to present objections, but in such latter event he would be precluded from challenging the judgment or order finally entered therein unless an appellate court determined that his motion to intervene was improperly denied by the trial court.
Under this analysis, the requirements of subsection (n) create special and unusual circumstances under Stallworth’s fourth factor which requires that the timeliness of would-be intervenors’ motions to intervene be assessed in light of the notice required under subsection (n)(l)(B). Likewise, the assessment under Stallworth’s third factor, the prejudice which the would-be intervenor will suffer if intervention is denied, should be assessed in light of the preclusive effect which subsection (n) produces as a result of such denial. Courts have often rationalized denying intervention on the grounds that the would-be intervenors could later bring their own separate suit to assert their particular remedies. Under subsection (n) this will no longer be true. Consequently, in my view, the proper course for our trial courts to follow when faced with a motion to intervene in a Title VII proceeding, is to permit such intervention when the motion for intervention is filed prior to the entry of the final decree, and prior to the date set for response in the notices sent out under Paragraph (1)(B) of subsection (n). Such course of action is fully consistent with the statements of policy reflected by the legislative history quoted above and fully reconciles the two great policy considerations which motivated Congress to pass subsection (n). The majority’s position, finding intervention untimely even when filed before entry of the consent decree and before the date for responses, is inconsistent with our well-established precedent and effectively forecloses meaningful participation by non-minority and other interested groups in Title VII litigation.[5] Such *1127 a bold departure from precedent should at least be acknowledged and discussed by the majority.
Having disposed of the motions to intervene, the trial court moved on to conduct what has been euphemistically referred to as the “fairness hearing.” This hearing occurred two days after the hearing on the motions to intervene, began at 9:00 a.m., had a lunch break, and was concluded at about 5:00 p.m. A large part of this hearing consisted of dialogue between counsel for the plaintiffs, the city, and the “objectors” and between those counsel and the court. In essence, the “hearing” consisted of a verbal rehash of the terms and conditions of the consent decree and the content of written objections which had been filed by many individuals and by the would-be intervenors. Some live testimony was presented by the police chief and by the statistical expert for plaintiffs. The court declined, however, to accept any live testimony tendered by an expert of HPPU, one of the would-be interve-nors-objectors. The document labeled “Findings of Fact and Conclusions of Law” which contains 102 pages, and which the trial court signed and filed the next day, was pre-drafted apparently by the plaintiffs and was present, and frequently referred to, during the fairness hearing. In my view, this “fairness hearing” was nothing more than a drill to permit the district court to rubber stamp its approval of the pre-drafted findings of fact and conclusions of law, and ultimately the consent decree. To label this hearing, as the majority does in their discussion of Stall-worth’s third factor, as in effect affording the would-be intervenors “their day in court” is to render that historical figure of speech meaningless. In my view, to “have your day in court” means that one is a party to the litigation, having all of the rights of discovery, rights of presentation of evidence and witnesses, the right to have disputed issues determined by an impartial trier of fact in accordance with the rules of evidence, and ultimately the right to appeal. I do not mean to say that the trial judge erred in failing to afford such a full blown evidentiary hearing to the objectors. Clearly, Paragraph (1)(B) of subsection (n) speaks only of “a reasonable opportunity to present objections” as the second requirement after sufficient notice. This statutory provision does not even contain the word “hearing” much less the words “evidentiary hearing” in defining the manner in which objections are to be presented. But, what I do mean to say, is that the status of “objector” under Paragraph (1)(B) is a far cry from the status of “a party intervenor” and “reasonable opportunity to present objections” is not the same as “a day in court.” For the majority to support its conclusion that the would-be interve-nors suffered no prejudice because they had their day in court is nothing but an empty rationalization.
MOTION TO' INTERVENE FOR APPEAL PURPOSES ONLY
During the course of the so-called intervention hearing, the idea that such would-be intervenors might be permitted to intervene for appeal purposes only was floated by the plaintiffs and the City of Houston. The district court picked up on this idea and included it in the second paragraph of its brief order denying intervention in the underlying action. On April 19, 1993, the date specified by the district judge’s invitation, the would-be intervenors filed such motions to intervene for appeal purposes only. On May 20, 1993, the district court entered an order denying the motions to intervene for purposes of appeal, and filed therewith an “Opinion on Denial of Intervention for Appeal” (“Opinion”). Since this document is the best evidence of what the district judge really had in his mind in ruling on the various motions, I quote two portions thereof which I think are extremely relevant:
1. These various groups argue that the consent decree does not help them, *1128 and worse, it hurts them. They assert that the remedy here injured them. Their remedy is not to intervene, but to object to the decree. They did, and they were not persuasive, (emphasis added) Opinion, at 3.
2. The non-parties assert that they should be allowed to intervene so that they can address on appeal the fact that their objections to the consent decree were overruled, and that they were not allowed to intervene in the case as parties. Their motions are made in a vacuum; they lack substance, support, and persuasion. Id. at 5.
While the first of the quoted paragraphs above was written some two months after the district court originally ruled on the primary motions to intervene in the main case, I think the underlined portion of that paragraph clearly indicates that the district court operated under a mistake of law as to the impact of subsection (n). For the reasons which I have set forth earlier, I think the explicit language of the statute and the supporting legislative history makes clear that rights of intervention under Rule 24(a) or (b) were not changed by the passage of subsection (n). Again, it is important to note that nowhere in its Opinion did the district court mention Rule 24(a) or (b), or subsection (n), or the Stallworth case, or any of the four factors defined in Stallworth as considerations to determine timeliness. Given this language used in the Opinion, I think the majority’s conclusion that the trial judge based his decision on “timeliness” is insupportable.
The second quoted paragraph above gives the district court’s explanation for denying the motions to intervene for purposes of appeal only. I think the district court was correct in denying such motions, but for reasons entirely different from those mentioned by the district court. First of all, I find no authority in any federal rule of civfi procedure for the filing of a motion to intervene for purposes of appeal only. Nothing in Rule 24 refers to such a motion and no one has cited any statute which creates such right. While I recognize that Stallworth characterizes our circuit’s rule regarding appeal of denial of a motion to intervene as “anomalous,” the majority’s tacit approval of the filing of a motion to intervene for appeal only, and consideration on appeal of the denial of such a motion, carries our circuit practice beyond the area of anomaly into the area of shear nonsense. A would-be intervenor certainly has a right to appeal from the denial of his motion to intervene under our practice, but if the trial court was right in denying such motion, then the would-be in-tervenor is finished, through, out-of-the case and in my judgment should not be permitted to file further motions or notices in that case. On the other hand, if the trial court was wrong in denying the motion for intervention, then the relief at the appellate level is to vacate the judgment entered into without the would-be intervenor’s participation, and remand the case with instructions to permit the intervention and proceed with a retrial. In either such event, the concept of a motion to intervene for appeal purposes only is sur-plusage.
Secondly, it is perfectly clear that subsection (n) does not contemplate any appellate review process after the “reasonable opportunity to present objections.” That would clearly be the situation if no one ever attempted to intervene in the main proceeding and simply decided to file a motion to intervene for appeal purposes only after the trial judge has conducted the “fairness hearing” and was unpersuaded by their objections. I do not think the court should infer an appellate process where Congress has not prescribed one, especially not as to the merits of the case. In this case, the would-be interve-nors whose original motions to intervene were denied, should not be able to intervene for appeal purposes only in order to appeal the court’s rejections of their objections. Since they have already given their notice of appeal as to the denial of their original motions to intervene, there really is nothing further which could be considered by a motion to intervene for appeal purposes only.
Consequently, I would conclude that this court does not have appellate jurisdiction to consider the denial of a motion to intervene for appeal purposes only in a Title VII action. I think the panel majority errs in *1129 undertaking that task. I note with interest however, that the panel majority proceeds to find (i) that the trial court erred in denying such motions, (ii) that the would-be interve-nors had an interest sufficient to support intervention as of right and were so situated that disposition of the action may, as a practical matter, impair or impede their ability to protect that interest, and (iii) that the existing parties, i.e., the plaintiffs and the City of Houston, did not adequately represent the interest of the would-be intervenors. In so doing, the panel majority makes clear that, but for their conclusion that the original motions to intervene were “untimely,” the would-be intervenors would have satisfied all of the other requirements of Rule 24(a) to justify intervention. Even assuming the trial court had denied intervention on the basis of untimeliness, and I do not believe it did, finding a motion to intervene untimely when filed both before the fairness hearing and before entry of judgment sets bold and, in my opinion, unwise new precedent. I am at a loss to understand the majority’s reasoning.
Having affirmed the district court’s denial of the original motion to intervene on the basis of “untimeliness,” and having dismissed the appeals relating thereto, the majority now turns around and takes appellate consideration of the trial court’s denial of motions to intervene for appeal purposes only, filed by individuals and groups who were no longer in the case, and reverses the denial of such motions on the grounds that these same persons and groups met all of the requirements of Rule 24(a) to intervene.
MERITS OF CONSENT DECREE
As pointed out by the majority opinion, neither the City of Houston nor the plaintiffs filed a notice of appeal of the final judgment of the district court approving and adopting the consent decree. This is not surprising since those parties had agreed to the entry of the consent decree in the first place. The only persons and groups who filed notices of appeal as to the entry of the final judgment were the would-be intervenors who filed those notices as part of the notices of appeal relating to the denial of their motions to intervene. These notices were filed in the interval between the filing of their motions to intervene for purposes of appeal and the order of the trial court denying such motions to intervene for purposes of appeal. Consequently at the time the notices of appeal relating to the merits of the consent decree were filed, the would-be intervenors were clearly not parties to the proceeding, because their motions to intervene originally had been denied and their motions to intervene for purposes of appeal only had not been acted upon. So, in my judgment, we face another enigma quite similar to the one discussed in the preceding section, and it boils down to this question: “Can our court take appellate jurisdiction of an appeal originating from a notice of appeal filed by parties and groups who were not at that time either original parties or intervenors and whose motions to intervene for appeal purposes only had been filed but not acted upon by the district court?” My answer to the question would be, “surely not.” Non-parties whose motions to intervene in the main case have been denied have standing to appeal only the denial of such intervention. As to other and further proceedings in that case, they remain non-parties until the appellate court reverses the denial of their motion to intervene, which the panel majority has concluded not to do in this case. Had the district court decided to permit their intervention for appeal purposes only, some argument might be made that permission should relate back to the notices of appeal which they previously filed regarding the merits of the consent decree. But, in this case, the district court denied their motions to intervene for appeal purposes only, so no relation back concept could be at work here. In addition to the problem of standing for filing notices of appeal, we face once again the problem that subsection (n) clearly does not make provision for any appeals from whatever the trial court decides to do in light of the filing of objections. Surely, when Congress has not made provision for an appeal, the courts should not “legislate” that there be one.
For the foregoing reasons, I think the panel majority makes a mistake in addressing the merits of the consent decree. I realize, of course, that the would-be interve- *1130 nors (“appellants”) spend a considerable portion of their briefs arguing the merits and the plaintiffs and the City of Houston, to a lesser extent, respond. However, this court has frequently stated that we are a court of limited appellate jurisdiction, that we can and should address sua sponte whether our jurisdiction exists, and that neither the parties’ expressed nor implied consent can vest our court with jurisdiction when it does not, in fact, exist. E.g., U.S. v. Garner, 749 F.2d 281 (5th Cir.1985). I realize also that in an earlier portion of this dissent, I made derogatory comments about the theory of the plaintiffs’ claims of “disparate impact.” I did so not to try to evaluate the merits of those claims, but to indicate, that in my judgment the claims asserted by the would-be interve-nors were sufficient to create a good faith controversy, and for the good of all concerned, employers and opposing groups or factions of employees, the place and time to resolve those controversies is in one single proceeding. When the employer is a public entity (as in this case) and when the relief proposed is remedial promotions and adjustments in seniority based directly on race, I think the role of a federal judge presented with a proposed consent decree takes on extremely critical importance. When the notices sent out under subsection (n) generate motions to intervene by individuals and groups of the quantity and quality as occurred in this case, i.e., the Houston Police Patrolmen’s Union, the Houston Police Officers Association, the Houston Airport Police Officers Association, the Park Police Officers Association, the Asian American Police Officers Association, and the Female Police Officers Association, then the court should be extremely careful in rushing to judgment on the basis of the proposed consent decree approved by the initial parties. Our system of justice is premised on the idea that truth can best be arrived at by subjecting the contentions of each side to the critical and adversarial examination by the other side. And whether, as in this case, “disparate impact” has in fact occurred, and whether, as in this case, remedies for such “disparate impact” have been carefully and narrowly tailored to cure only the “disparate impact” can best be determined by submitting the controversies to impartial jury and judge. When all parties potentially affected and involved agree on the essential findings and conclusions, a consent decree is certainly appropriate.[6] But when real and substantial segments of the employee population assert that “disparate impact” did not occur and that the remedial changes go beyond the scope of the alleged “disparate impact” and affect their individual interests, then they should be allowed to intervene and present those contentions ultimately, if necessary, to the jury and judge. Obviously, that may produce more work for the court and some delay at arriving at a final determination, but the provisions of the Federal Rules of Civil Procedure are clearly adequate to provide for the prompt elimination of frivolous and insupportable contentions, the severance of the process into separate liability and remedy determinations, and the entry of either summary or post-trial judgments which will truly be binding upon all of the parties and interests and thoroughly satisfy the public interest in the finality of such determinations.
In conclusion, I do not agree that the trial court denied the motions to intervene on the basis of untimeliness. Instead, the opaque statements quoted by the majority and the district court’s opinion denying intervention for purposes of appeal suggest that the trial judge believed that subsection (n) of the 1991 amendments to the Civil Rights Act established a new threshold for due process: substituting notice and an opportunity to object for a meaningful opportunity to be heard at a meaningful time. However, even if I agreed that this was the court’s rationale, the decision today flies in the face of established precedent as well as the stated policy of subsection (n) of the 1991 amendments to the Civil Rights Act of 1991. As far as I know, *1131 we have never found intervention filed before entry of the consent decree to be untimely. I believe the would-be intervenors in this case acted as quickly as possible by moving approximately six weeks after statutorily anticipated notice, before the expiration of the time allotted for objections and before the fairness hearing.
I do not agree that they had their “day in court” either in the trial court below or here on appeal. Our decision today appears to condone judicial approval of privately negotiated consent decrees without consideration of potentially affected interests. Considering the preclusive effect of subsection (n) of the 1991 amendments to the Civil Rights Act, I do not think such an approach affords due process.
Finally, neither the denial of the so-called “motions to intervene for purposes of appeal only,” for which I can find no basis in the Federal Rules of Civil Procedure, nor the substantive merits of the consent decree, which were appealed only by persons who were not party to this suit, were properly before this court.
For all of the foregoing reasons, I would REVERSE the decision of the trial court denying the original motions for intervention, VACATE the final judgment approving the consent decree, and REMAND this case to the trial court for further proceedings. I would also DISMISS the appeal of the denial of the motion to intervene for appeal purposes only, and DISMISS the appeal as to the merits of the final judgment entered by the trial court, on the grounds of lack of appellate jurisdiction in both cases.

. See, e.g., Thaggard v. City of Jackson, 687 F.2d 66 (5th Cir.1982), cert. denied sub nom., Ashley v. City of Jackson, 464 U.S. 900, 104 S.Ct. 255, 78 L.Ed.2d 241 (1983); Dennison v. City of Los Angeles Dep’t of Water & Power, 658 F.2d 694 (9th Cir.1981).

. See Thaggard, 687 F.2d at 69.

.Id. at 763, 109 S.Ct. at 2185; see, FRCP 24(a) (intervention as of right) ("Upon timely application anyone shall be permitted to intervene"); FRCP 24(b) (permissive intervention) (“Upon timely application anyone may be permitted to intervene”).

. In essence what the majority opinion and the special concurring opinion would establish as precedent for cases involving consent decrees is a rule that once the original parties to the litigation agree on the terms and conditions of a consent decree and issue the notices required by subsection (n), any attempt by a third party to intervene is untimely as a matter of law. In my view, that just cannot be what Congress intended by the adoption of subsection (n).

. Our decisions finding intervention untimely have all involved motions filed well after entry of the consent decree. See Corley v. Jackson Police Dep’t, 755 F.2d 1207 (5th Cir.1985) (intervention untimely when filed 50 months after consent decree entered); Smith v. Missouri Pac. R. Co., 615 F.2d 683 (5th Cir.1980) (intervention untimely when filed 2 years after entry of judgment); Hefner v. New Orleans Public Serv., Inc., 605 F.2d 893 (5th Cir.1979) (intervention untimely when filed two years after entry of judgment), cert. denied, 445 U.S. 955, 100 S.Ct. 1639, *1127 64 L.Ed.2d 231 (1980); United States v. Allegheny-Ludlum Indus., Inc., 553 F.2d 451 (5th Cir.1977) (intervention untimely when filed seven and one-half months after judgment), cert. denied, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978). Our landmark decision in Stall-worth found intervention timely when filed one month after entry of judgment. See Stallworth, 558 F.2d at 266. (The mere fact judgment has already been entered should not require that intervention be denied as untimely.)

. Such a case was relied on, inappropriately I believe, by the trial judge. At the hearings and in the Findings of Fact and Conclusions of Law, the trial judge and the original parties relied upon evidence generated in the case involving Houston Firefighters. Houston Chapter of the Int’l Ass'n of Black Professional Firefighters v. City of Houston, 56 Fair Empl.Prac.Cas. (BNA) 445, 1991 WL 340296 (1991). In that case, however, the non-minority interests were certified as a class, participated in the negotiations and signed the proposed consent decree.