Jesse **TOMPKINS, Audra Beasley, James W. Scott, Rodney Smith,** for themselves and all others similarly situated, Plaintiffs,

v.

**ALABAMA STATE UNIVERSITY,** Alabama State University Board of Trustees, State of Alabama, Dr. William H. Harris, President of Alabama State University, Dr. Roosevelt Steptoe, President of Academic Affairs, Director of Student Activities, Governor Fob James, Ex–Officio President, Joe L. Reed, Chairman, Frankye U. Underwood, Vice Chairwoman, Richard Arrington, Jr., B. Maxine Corley, James C. Cox, LaRue W. Harding, Toreatha M. Johnson, Larry H. Keener, Patsy D. Parker, Donald V. Watkins, all named in their individual and official capacities, Defendants.

Civil Action No. 97–M–1482–S.

United States District Court,
N.D. Alabama,
Southern Division.

May 1, 1998.

L. Vastine Stabler, Jr. Birmingham AL, Joseph A Wallace, Elkins WV, Michael A. Rosman, Center for Individual Rights, Washington, DC, for Plaintiffs.

Solomon S. Seay, Jr. Montgomery, AL, Terry G. Davis, Montgomery, AL, Armand Derfner, Charleston SC, John E. Grenier & Robert D. Hunter, Lange Simpson Robinson & Somerville, Birmingham, AL, for Defendants

## ORDER

HAROLD L. MURPHY, District Judge.

This is a civil rights case in which Plaintiffs challenge Defendant Alabama State University's use of "other-race" scholarships to remedy vestiges of segregation found to exist in the Alabama system of public higher education. The case is before the Court on Defendant State of Alabama's Motion to Dismiss and Defendants Alabama State University Board of Trustees, et al.'s Motion to Dismiss.

## I. Background

A summary of the factual context in which this lawsuit is brought begins long before the filing of Plaintiffs' Complaint. This case exists in the shadow of a monumental desegregation lawsuit involving all public universities in the State of Alabama and a plaintiff class of all black citizens of the State of Alabama. *Knight v. Alabama*, 787 F.Supp. 1030, 1045–46 (N.D.Ala.1991) (certifying class). The Court therefore will first summarize the relevant history of the *Knight* litigation, and afterward will summarize the relevant history of this case.

### A. The *Knight* Litigation

The *Knight* litigation commenced on January 15, 1981, when John F. Knight, Jr., and a class of other alumni, students, and faculty members of Alabama State University ("ASU") filed suit in the Middle District of Alabama to attack alleged vestiges of segregation in public higher education. *Knight v. Alabama*, 787 F.Supp. 1030, 1048 (N.D.Ala. 1991) ("*Knight I* "). Since then, the litigation has followed a complicated and convoluted path in which the following entities were added as parties: the United States, the Governor of Alabama, the Alabama State Board of Education, and all four-year Alabama public universities and colleges. *Id.* at 1048–50.

This Court held two trials in the *Knight* case, one lasting six months and another lasting six weeks. *Id.* at 1051; *Knight v. Alabama*, 900 F.Supp. 272, 280 (N.D.Ala. 1995) ("*Knight II* "). Both trials resulted in findings that vestiges of segregation remained within the Alabama system of public higher education, and that these vestiges violated Title VI of the Civil Rights Act of 1964 as well as the United States Constitution. *Knight I*, 787 F.Supp. at 1368; *Knight II*, 900 F.Supp. at 280–281.

A summary of the remedies approved by the Court to eliminate these vestiges of segregation would fill dozens of pages. The only remedy relevant to the instant lawsuit is the creation of a scholarship program that employs race as a criterion when selecting students to receive the scholarships. *Knight II,* 900 F.Supp. at 319–21, 356–58. These scholarships, known as "other-race" scholarships, are designed to encourage non-African American students to attend historically black institutions. *Id.*

The Court has retained active jurisdiction over the *Knight* case to this day, including the appointment of a Monitor and an Oversight Committee to oversee on a daily basis the administration of the Court-ordered remedies in the *Knight* litigation. For example, as recently as April 24, 1998, the Court held a hearing in order to review the progress toward unification of the Alabama land grant system.

### B. The *Tompkins* Litigation

On October 1, 1997, Plaintiffs Jessie Tompkins, Audra Beasley, James W. Scott, and Rodney Smith filed this lawsuit on behalf of all non-white individuals similarly situated to Plaintiffs. (Second Amended Compl. at 4.) Plaintiffs are black citizens of the State of Alabama, and thus are members of the class certified in the *Knight* litigation.

Plaintiffs nonetheless claim that the "other-race" scholarships created at ASU pursuant to the Court's 1995 Decree in *Knight II* violate their rights under the Fourteenth Amendment and 42 U.S.C.A. §§ 1981, 1983, and 2000d. (*Id.* at 2.) Plaintiffs name as Defendants the State of Alabama, ASU, the ASU Board of Trustees, and various ASU administrators. (*Id.* at 3–4.) Plaintiffs seek to certify this case as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). (*Id.* at 4.)

On October 20, 1997, Defendant ASU Board of Trustees and several of the individually named Defendants filed the instant Motion to Dismiss, which was followed on November 4, 1997, by Defendant State of Alabama's Motion to Dismiss.

On December 12, 1997, the Court invited the named Plaintiffs in *Knight* to file a brief as *amicus curiae.* On January 5, 1998, the *Knight* Plaintiffs filed their *amicus* brief and an accompanying Motion to Intervene in the *Tompkins* case.

Finally, on February 17, 1998, the United States sent to the Court a letter outlining its position with respect to the *Tompkins* case. Although the letter is not styled as an official motion, the United States served a copy of the letter on all parties involved in the *Knight* and *Tompkins* cases.

Defendants' Motions to Dismiss, the *Knight* Plaintiffs' *amicus* brief, and the letter by the United States all raise several objections to the Court's consideration of the claims raised by the *Tompkins* Plaintiffs. First, Defendants, the *Knight* Plaintiffs, and the United States all argue that the *Tompkins* Plaintiffs have brought their claims in the wrong forum, thus warranting dismissal of this case with leave to request intervention in the *Knight* litigation. Defendants and the *Knight* Plaintiffs also argue that the *Tompkins* Complaint must be dismissed on the merits because: (1) the *Tompkins* Plaintiffs lack standing to bring their claims; and (2) the *Tompkins* Plaintiffs' claims are barred by res judicata and collateral estoppel.[1]

The *Tompkins* Plaintiffs offer two responses to these arguments. First, Plaintiffs argue that this lawsuit is not a collateral attack on the relief ordered in the *Knight* litigation, but is rather a separate action based on an entirely independent cause of action. Second, Plaintiffs argue that, if this lawsuit is classified as a collateral attack on the *Knight* litigation, Plaintiffs are entitled by law to attack collaterally the remedies adopted in *Knight* so long as they demonstrate that the *Knight* Plaintiffs inadequately represented their interests as class members in the *Knight* litigation. The *Tompkins* Plaintiffs thus argue that they intend to show that their interests as class members in *Knight* were represented inadequately by the *Knight* Plaintiffs.

---

**1.** Defendants and the United States also argue that the *Tompkins* Complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(7) for failure to join indispensable parties. Because the Court concludes that dismissal of this case is warranted on other grounds, the Court need not address this argument.

## II. Discussion

### A. Plaintiffs' Argument That the *Tompkins* Lawsuit Is Not a Collateral Attack

Plaintiffs argue that the *Tompkins* lawsuit is not a collateral attack on the relief ordered in the *Knight* litigation, but is rather a separate action based on an entirely independent cause of action. Plaintiffs therefore argue that the *Tompkins* case raises no procedural or res judicata concerns with respect to the *Knight* litigation. In support of this argument, Plaintiffs rely primarily on *Barfus v. City of Miami*, 936 F.2d 1182 (11th Cir.1991).

■ Plaintiffs' argument can be rejected with little effort. In *Barfus*, the court held that nonminority firefighters were entitled to bring a separate Title VII employment discrimination action against the City of Miami even though the firefighters' union signed a consent decree in another case that governed the hiring of minority firefighters. 936 F.2d at 1186–88. The court premised its holding on the fact that the nonminority firefighters did not challenge the terms of the decree itself or seek to modify the decree in any way. *Id.* at 1185 & n. 14 (the firefighters "do not argue that *actions taken pursuant to the decree* resulted in discrimination") (emphasis added). Instead, the firefighters raised individual and independent claims premised upon Title VII. *Id.* "The issue sought to be litigated here was not involved in the consent decree" signed by the firefighters' union. *Id.* at 1188; *see also O'Shea v. City of San Francisco*, 966 F.2d 503, 505 (9th Cir.1992) (res judicata is not implicated when plaintiffs "do not challenge the terms of the decree, nor seek to modify the decree").

The *Tompkins* Plaintiffs, on the other hand, directly challenge the terms of a de-cree entered by the Court in *Knight* that ordered the creation of "other-race" scholarships. Plaintiffs themselves admit as much, conceding in their brief that the *Tompkins* action "is an attack on the [*Knight II*] Decree itself." (Pls.' Br. in Opp. to Mot. to Dismiss the Second Amended Compl. at 6.) The *Tompkins* Plaintiffs also challenge an issue that was expressly litigated by the parties and addressed by the Court in *Knight II* before the Court entered its 1995 Decree.[2] *Barfus* thus is factually inapposite to the circumstances presented here, and does not constitute authority that allows Plaintiffs to maintain the *Tompkins* case as an independent discrimination action.

### B. Whether *Tompkins* Must Be Dismissed as a Collateral Attack on the Relief Ordered in *Knight*

■ As a general rule, the res judicata effect of a judgment in a class action extends to the entire certified class, thus binding absent class members. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 808–10, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *Gonzales v. Cassidy*, 474 F.2d 67, 74 (5th Cir.1973).[3] Federal courts, however, recognize that absent class members hold a due process right to attack collaterally the res judicata effects of a class action judgment if the absent class members establish that the class representatives inadequately represented the interests of the class. *Hansberry v. Lee*, 311 U.S. 32, 42–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *Guthrie v. Evans*, 815 F.2d 626, 628 (11th Cir.1987); *Gonzales*, 474 F.2d at 74.

Several courts, including the former Fifth Circuit, do not apply the general rule enunciated in *Hansberry*, *Guthrie*, and *Gonzales* when the original class action is a school

---

2. The *Knight* parties submitted extensive briefing on the remedial use of "other-race" scholarships and the constitutional standards that control their implementation and design. *E.g.*, State Defs.' Proposed Findings of Fact and Conclusions of Law, at 64–65, 117–23, 179–80 (filed on or about May 1, 1995, in *Knight*); 1995 UAS Proposed Findings of Fact, at 149–56 (filed on or about May 1, 1995, in *Knight*); Alabama A & M Univ.'s Mem. of Law Regarding *Podberesky v. Kirwan* (filed on or about June 20, 1995, in *Knight*); Knight–Sims Pls.' Mem. on Recent Decisions Relating to Other–Race Scholarships (filed on or about June 30, 1995, in *Knight*);

Resp. of Bd. of Trustees of the Univ. of Alabama to Briefs Filed by Alabama A & M, ASU, and the Knight–Sims Pls. Regarding the Impact of the *Podberesky* Case and Recent Supreme Court Opinions (filed on or about July 20, 1995, in *Knight*); Knight–Sims Pls.' Reply to the Univ. of Alabama's *Podberesky* Br. (filed on or about July 25, 1995, in *Knight*).

3. Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209–11 (11th Cir.1981) (en banc).

desegregation case. *Rivarde v. Missouri*, 930 F.2d 641, 642–43 (8th Cir.1991); *Miller v. Board of Educ.*, 667 F.2d 946, 948–49 (10th Cir.1982) (per curiam); *Hines v. Rapides Parish School Bd.*, 479 F.2d 762, 765 (5th Cir.1973). As summarized by the Tenth Circuit:

> The necessity for an orderly administration of the courts does at times require the consolidation of actions or a direction to seek intervention in ongoing class actions where the same issues are presented[,] where the plaintiffs are apparently members of the class [and where they are] proceeding against the same or some of the same defendants. There is no right to maintain separate actions in these circumstances.

*Miller*, 667 F.2d at 949. Thus, "separate actions attacking the implementation of [a] desegregation program ... should not proceed separately," but rather should be dismissed so that the collateral plaintiffs may petition for intervention in the original desegregation case. *Id.* at 947.

The seminal case for this line of authority is *Hines*. In *Hines*, the original desegregation case featured a class of black students who attended public schools in a Louisiana parish and the students' parents. 479 F.2d at 764. After appointing a biracial committee to work with federal and local government officials, the district court approved a plan that was designed to integrate the schools. *Id.* The district court retained jurisdiction over the case, which remained "an active viable lawsuit under the control of the district court." *Id.*

Apparently disenchanted with the plan approved by the district court, a group of black and white parents filed a separate lawsuit challenging the plan adopted by the district court. *Id.* at 763. The Fifth Circuit expressed its concern with the significant resources that would be expended if such duplicative lawsuits became a regular practice:

> Certainly every group must be allowed the opportunity to show the court that the desired and legally required unitary school system has not been achieved by an earlier court order. [Nonetheless,] ... this court must ... set out a method which allows parent groups to present their complaints about the school system which results from a desegregation order without fostering a multiplicity of new lawsuits over the same complicated and emotional issues which have already once been fought out in an all too lengthy court battle.

*Id.* at 765. The most appropriate course, the court concluded, was for the new set of plaintiffs to petition the district court to allow them to intervene in the original desegregation case. *Id.* "The petition for intervention would bring to the attention of the district court the precise issues which the new group sought to represent and the ways in which the goal of the unitary system had allegedly been frustrated.... If the court felt that the new group had a significant claim which it could best represent, intervention would be allowed." [4] *Id.*

The Tenth Circuit confronted a similar situation in the context of the historic *Brown v. Board of Education* desegregation litigation. *Miller*, 667 F.2d at 947. In *Miller*, two classes of black students filed separate lawsuits attacking the implementation of the desegregation plan required by the Supreme Court in *Brown*. 667 F.2d at 947. The district court consolidated the *Miller* actions and dismissed both, noting that the plaintiffs should have petitioned for leave to intervene in the still-pending *Brown* desegregation case. *Id.* The Tenth Circuit agreed. "To allow these actions to proceed independently would result in a duplication and waste of the time and effort of the litigants and the Court. The issue which plaintiffs seek to raise herein are already before the Court in *Brown* .... Furthermore, the continued prosecution of these actions risks inconsistent judgments." *Id.* at 948.

The Eighth Circuit later relied on *Hines* and *Miller* to address factually similar cir-

---

**4.** The vitality of the holding in *Hines* is not altered in any respect by the Supreme Court's decision in *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). As the *Tompkins* Plaintiffs recognize, *Martin* involved the claims of *nonparties* who failed to intervene in a class action and thus were permitted to attack collaterally the class judgment. In *Hines*, the collateral plaintiffs included members of the original class who were parties in the original class action; the same is true of *Miller* and *Rivarde*, as discussed below.

cumstances that arose in a desegregation case involving Kansas City schools. *Rivarde,* 930 F.2d at 642. In *Rivarde,* a class of black students brought the original desegregation case, which resulted in a long-term oversight program that continued to be administered by the district court. *Id.* Later, a group of black students filed a separate lawsuit, alleging that the original desegregation program violated their constitutional rights. *Id.* The district court dismissed the separate action and instead treated the complaint as a motion to intervene in the original desegregation case. *Id.* The Eighth Circuit affirmed, concluding that, although *Hines* and *Miller* are not binding authority in the Eighth Circuit, the cases are sufficiently "factually similar and persuasive" to justify the court's reliance upon the courts' reasoning. *Id.* at 644.

*Hines, Miller,* and *Rivarde* thus do not apply the general rule enunciated in *Hansberry* that absent class members are permitted to bring separate actions to attack class judgments. In fact, none of the opinions make any attempt whatsoever to reconcile the two lines of authority. This task therefore is left to the Court.

The Court believes that *Hines, Miller,* and *Rivarde* carve out an exception to the general rule enunciated in *Hansberry.* First, and most importantly, the *Hines* rule is premised upon interests in judicial economy in desegregation cases, which would be contravened by allowing absent class members to wage collateral attacks upon expensive and complicated desegregation plans. *See Rivarde,* 930 F.2d at 643 (*Hines* and *Miller* "based their rulings on interests of judicial economy"). In other words, in the costly and time-consuming microcosm of desegregation litigation, courts have the discretion to consolidate claims when appropriate, including collateral attacks brought by absent class members. *See Davis v. Board of Sch. Comm'rs,* 517 F.2d 1044, 1049 (5th Cir.1975) ("our policy of required intervention is analogous to the discretionary power in the court to require consolidation [under Federal Rule of Civil Procedure 42(a) ]").

Second, and perhaps of equal importance, school desegregation cases feature a factual distinction from *Hansberry* and its progeny: the desegregation programs which the collat-

eral plaintiffs are attacking all are active, viable cases that remain under the jurisdiction of the district court. *E.g., Rivarde,* 930 F.2d at 641; *Miller,* 667 F.2d at 947; *Hines,* 479 F.2d at 764. *Hansberry* and *Gonzales,* on the other hand, involve collateral plaintiffs challenging the *final* judgments entered in class actions that had been terminated and in which no actions would be taken by the court in the future. *Hansberry,* 311 U.S. at 39, 61 S.Ct. 115; *Gonzales,* 474 F.2d at 71. The collateral plaintiffs in *Hansberry* and *Gonzales* thus had no viable cases in which to intervene because the final relief already had been ordered on their behalf and the case files had been closed. In comparison, collateral plaintiffs in a desegregation case have a viable, pending action in which to seek relief.

■ The Court therefore concludes that *Hines* and its progeny can be boiled down to the following proposition: when absent members of a class of school desegregation plaintiffs seek to challenge an actively administered desegregation plan in a collateral action, the collateral action should be dismissed so that the class members can petition to intervene in the existing desegregation action. The dismissal is on procedural, rather than substantive, grounds and should not be interpreted in any way as an assessment of the merits of the class members' claims.

This conclusion has been applied by courts in the Eleventh Circuit and beyond with little fanfare. In *Mannings v. School Bd. of Hillsborough County,* 796 F.Supp. 1491 (M.D.Fla. 1992), the district court enjoined state administrative proceedings because the state proceedings challenged an established desegregation plan that was being administered in an existing federal lawsuit. 796 F.Supp. at 1497. The court instead required the state plaintiffs to file a petition in the federal court administering the desegregation plan for leave to intervene in that action. *Id.; see also Jones v. Caddo Parish Sch. Bd.,* 735 F.2d 923, 947 (5th Cir.1984) (Higginbotham, J., dissenting) (observing that, although class member has right to file collateral attack on desegregation order, the "preferred course of action" is to intervene in a pending action rather than file a separate lawsuit); *Davis,*

517 F.2d at 1046 ("[T]his court [has] held that the proper and orderly procedure to be followed by third parties in seeking to question deficiencies in the implementation of desegregation orders or for further relief in ongoing school cases is by petition to intervene."); *Harris v. Birmingham Bd. of Educ.*, 90 F.R.D. 263, 265 (N.D.Ala.1981) (denying class certification motion because "the appropriate vehicle" for the plaintiffs' claims "is not a separate class action, but a complaint in intervention timely filed in the [original desegregation] case."); *cf. United States v. Franklin Parish Sch. Bd.*, 47 F.3d 755, 757 (5th Cir.1995) (relying upon *Hines* to assess the propriety of allowing a group of class members to intervene in the original desegregation case).

■ Factually, the *Tompkins* case provides an ideal opportunity to apply the principles recognized in *Hines, Miller*, and *Rivarde*. The Court continues to assert active jurisdiction over the *Knight* case, with the assistance of a Court-appointed Monitor and a Court-appointed Oversight Committee who meet regularly. All of the parties who would be required for a full adjudication of the issues raised by the *Tompkins* Plaintiffs are present and actively involved in the *Knight* case. The Court's activity in the *Knight* case thus is ongoing, as it continues to oversee the remedial effectiveness of the desegregation efforts in general and the use of "other-race" scholarships in particular. Indeed, the Court recently ordered its Monitor to review the "other-race" scholarship programs at both ASU and Alabama Agricultural and Mechanical University ("AAMU") and report on whether the scholarships are achieving the purpose for which they were created. *Knight*, No. 83–M–1676, slip op. at 1–2 (N.D.Ala. Jan. 12, 1998).[5] The Monitor reported to the Court that he and the Oversight Committee visited both ASU and AAMU and reviewed the scholarship programs with university officials. The Court expects to receive a report from the Monitor shortly.

Given these circumstances, there exists an active, viable lawsuit in which the *Tompkins*

Plaintiffs are able to seek intervention and present their claims. The judicial economy arguments addressed in *Hines, Miller*, and *Rivarde* apply with particular force here. The litigation of a collateral challenge to the ongoing *Knight* litigation would drain the resources of the parties and the Court. This result is inefficient and inappropriate given that a far more practical route already exists.

■ The *Tompkins* Plaintiffs argue that dismissing their lawsuit would toll the death knell of the due process rights for absent class members recognized in *Hansberry*. The Court disagrees. First, unlike the collateral plaintiffs in *Hansberry*, the *Tompkins* Plaintiffs still have a viable legal forum in which to present their claims. The absent class members simply must satisfy the requirements imposed on *all* litigants who wish to intervene in pending class litigation, which courts uniformly have agreed is sufficient to protect the constitutional rights of absent class members.

■ Furthermore, the due process rights of the absent class members receive no greater protection in a collateral lawsuit than they receive as an intervenor in the pending desegregation case. A collateral attack on a class judgment inquires whether the class representatives have fairly and adequately represented the interests of the absent class members. *Gonzales*, 474 F.2d at 72. "The primary criterion . . . is whether the representative, through qualified counsel, vigorously and tenaciously protected the interests of the class." *Id.* at 73. This examination essentially mirrors an assessment of an absent class member's eligibility to intervene in existing desegregation litigation:

> The [petitioners] would bring to the attention of the district court the precise issues which the [petitioners] sought to represent and the ways in which the goal of the unitary school system had allegedly been frustrated. The district court . . . then determined whether these matters had been previously raised and resolved and/or *whether the issues sought to be presented by the [petitioners] were currently known*

5. A copy of the Court's January 12, 1998, Order in the *Knight* case was placed into the record of this case.

*to the court and parties in the initial suit.* If the court determines that the issues the [petitioners] sought to present had been previously determined or if it found that the parties in the original action were aware of these issues and completely *competent to represent the interests of the [petitioners]*, it could deny intervention. If the court felt that the [petitioners] had a significant claim which *[they] could best represent*, intervention would be allowed. *Hines*, 479 F.2d at 765 (emphasis added). Hence *Hines* and *Gonzales* both measure the competency of representation by the class representatives on the issue presented by the collateral plaintiffs; if the representation failed to protect the collateral plaintiffs' due process rights, the collateral plaintiffs are permitted to raise the issue anew in the appropriate legal forum. *See Davis*, 517 F.2d at 1049 ("Intervention would not result in the loss of substantive or procedural rights.").

### C. Summary

For the reasons set forth above, the Court concludes that the most appropriate course of action is to exercise its discretionary authority to dismiss Plaintiffs' case with leave to petition for intervention in *Knight*. *Hines*, 479 F.2d at 765; *Miller*, 667 F.2d at 948–49; *Rivarde*, 930 F.2d at 642–43; *Mannings*, 796 F.Supp. at 1497; *Harris*, 90 F.R.D. at 265. If Plaintiffs wish to challenge the legality of the "other-race" scholarship program at ASU, or at any other public university in Alabama, they must request to intervene in the *Knight* litigation pursuant to Federal Rule of Civil Procedure 24 and other relevant authority.

As discussed above, the Court's conclusion is premised upon concerns of judicial economy, efficiency, and fairness to all parties interested in the outcome of this case. The Court expresses no opinion regarding the merits of Plaintiffs' claims; similarly, the Court does not reach the validity of the many defenses proffered by Defendants and the *Knight* Plaintiffs, including Plaintiffs' lack of standing [6] and res judicata. All these issues remain to be litigated and resolved if and when the *Tompkins* Plaintiffs move to intervene in the *Knight* litigation.

### III. Conclusion

ACCORDINGLY, the Court **GRANTS** Defendant State of Alabama's Motion to Dismiss and **GRANTS** Defendants Alabama State University Board of Trustees, et al.'s Motion to Dismiss. The Court **DISMISSES** this case with leave for Plaintiffs to file a motion to intervene in *Knight v. Alabama*, No. 83–M–1676 (N.D.Ala.). All other pending motions in this case are **DENIED AS MOOT**.

The Court further DIRECTS the Clerk to file a copy of this Order in the record in the *Knight* case, and to serve a copy of this Order upon all parties in the *Knight* case.

---

**6.** For a discussion regarding a party's standing under Article III when considered in the context of a request to intervene under Rule 24, *see* *Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1512 n.4 (1996), and *Chiles v. Thornburgh*, 865 F.2d 1197, 1212 (11th Cir.1989).